Ruby J. GIFFORD, Plaintiff,

v.

The ATCHISON, TOPEKA AND SANTA
FE RAILWAY COMPANY, et al.,
Defendants.

No. CV 77–4343–HP.

United States District Court,
C.D. California.

Jan. 24, 1980.

**2**

Bennett Rolfe, LeBel & Rolfe, Santa Monica, Cal., for plaintiff.

Matthew H. Witteman, Richard L. Rosett, Los Angeles, Cal., for defendant, The Atchison, Topeka and Santa Fe Ry. Co.

George E. Bodle, Raymond W. Thomas, Law Offices of George E. Bodle, Los Angeles, Cal., for defendant, Brotherhood of Ry. and Airline Clerks.

## AMENDED MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT TO ALL DEFENDANTS

PREGERSON, Circuit Judge, Sitting by Designation.

This Title VII employment discrimination suit is now before the court on defendants' motions for summary judgment. Plaintiff is Ruby J. Gifford. Defendants are her former employer, The Atchison, Topeka and Santa Fe Railway Co., the union that represented her at the time of her employment, Transportation Communication Employees Union Santa Fe System Division No. 61 ("TECU"), and TECU's successor in interest, the Brotherhood of Railway and Airline Steamship Clerks. Gifford makes three claims: First, she asserts that a collective bargaining agreement between Santa Fe and her union, which became effective October 1, 1965, contained certain provisions that discriminated against her on the basis of her sex. Second, she asserts that Santa Fe discriminated against her on the basis of sex by failing to promote her to the position of wire chief. Finally, she asserts that she was discharged by Santa Fe and dropped from membership in the union in retaliation for opposing employment practices made unlawful by Title VII and for participating in the procedures provided by Congress for the protection of Title VII rights. After considering the pleadings, the memoranda of law, the stipulation of facts, the affidavits and exhibits, and the oral argument of counsel on July 9, 1979, the court determines that there is no genuine issue as to any material fact and that defendants are entitled to summary judgment as a matter of law.

### I. Factual Background

Gifford began her employment with Santa Fe in 1944 in Bakersfield, California and continued working in Bakersfield for Santa Fe until she resigned on February 7, 1966. Two weeks after her resignation she was re-employed by Santa Fe but again resigned on March 6, 1966. She was once again re-employed on March 28, 1966 and once again resigned on April 13, 1966. Her final re-employment occurred on April 20, 1966 and her final termination by Santa Fe was effective at the close of work on December 22, 1967. During most of her employment with Santa Fe, Gifford worked as a printer clerk.

Gifford's three resignations in 1966 were precipitated by requests by Santa Fe that she temporarily work at Santa Fe offices outside of Bakersfield. Prior to October 1,

1965, her collective bargaining agreement gave her the right to refuse such requests, but under the agreement that became effective on that date, she was required to honor them. Gifford did not want to work outside of Bakersfield, even temporarily, because she felt that that would unduly interfere with her ability to take care of her home and family. After each request, Gifford resigned in order to avoid a formal investigation by Santa Fe into her refusal to honor its work request. Such an investigation would have resulted in her discharge and precluded her from being re-employed by Santa Fe at a later date.

Each time Gifford was re-employed by Santa Fe in 1966, she was deemed a new employee and was given a new seniority date. Thus, she lost the seniority she had accumulated between 1944 and 1966. Gifford also lost vacation rights and certain "pass rights" because of her resignations.

While employed by Santa Fe, Gifford would on occasion fill in and perform some of the functions of a "wire chief." The duties of a wire chief and a printer clerk— her regular job—were substantially the same. One difference was that wire chiefs were required to do certain types of equipment repair that necessitated the lifting of weights in excess of twenty-five pounds. California law at that time prohibited female employees from lifting weights in excess of twenty-five pounds and Gifford did not lift such weights while working as a printer clerk or as a substitute wire chief. In an affidavit, Gifford states in a conclusory manner that Santa Fe could have hired women as wire chiefs by allocating the lifting duties to other employees. Gifford never applied for a promotion to the position of wire chief.

As indicated above, Gifford was dissatisfied with the provisions of the collective bargaining agreement that became effective October 1, 1965, because she did not wish to work outside of Bakersfield. This dissatisfaction was communicated both to her union and to Santa Fe in 1966 and 1967. For example, in a letter dated February 7, 1966 (the date of her first resignation) she told the union and Santa Fe that she could not work outside of Bakersfield because of her family responsibilities and that "the Union sold me down the river with their [sic] new contract . . . ."

Gifford's unhappiness with the contract culminated in her refusal to pay her union dues during the last half of 1967. On September 12, October 5, and October 26, 1967, the union sent letters to Gifford informing her that she was delinquent in paying her dues. When Gifford did not respond to these reminders, the union wrote Santa Fe on November 20, 1976 advising that Gifford had failed to pay the required dues and requesting that she be terminated pursuant to the terms of the union shop agreement between the union and Santa Fe. Four days later, Santa Fe wrote Gifford that Santa Fe had been advised that she had failed to pay her dues, that if this was true she would be dismissed, that she had ten days in which to request a hearing, and that if she did not request a hearing the charge would be taken as true and her employment would be terminated. On November 29, Gifford wrote the union and Santa Fe again expressing her dissatisfaction with her union's representation of her in the negotiations that led up to the October 1, 1965 agreement. She also stated in that letter that she would be filing complaints with various agencies, including the Equal Employment Opportunities Commission ("EEOC"), and in the copy to the union she enclosed the dues that were owing. Her reference to the EEOC in the November 29 letter was the first time she indicated that she might have been the victim of employment discrimination. On December 6, Gifford wired Santa Fe requesting a hearing, but for unexplained reasons, the telegram did not reach Santa Fe until December 21, two weeks after the appeal period had expired. The union did not accept Gifford's tender of dues and, since Gifford had not properly requested a hearing, Santa Fe terminated her. The union also dropped her from its membership rolls.

According to the stipulation of facts, seventeen cases have arisen on the Coast Lines

of Santa Fe (the western regional division of the company) in which the union wrote Santa Fe requesting that an employee be terminated pursuant to the union shop agreement because the employee had failed to pay union dues, initiation fees, or assessments. The stipulation does not specify the time period in which these cases arose. In two of the seventeen cases, the union withdrew its discharge request and the affected employee was allowed to make a late payment. One of these employees had actually paid the dues owing before the union had sent its request to Santa Fe and had not paid a special assessment fee only because he had not received proper notice of this assessment. The other employee, a printer clerk in the Bakersfield office, was allowed to make a late payment and continue working for Santa Fe when Santa Fe asked the union to withdraw its discharge request, and the union complied, because there was a shortage of printer clerks in the Bakersfield office at that time. According to Gifford, this occurred in 1967, the year she was discharged. In five other cases, the employee claimed payment, or set forth an excuse for nonpayment and asked permission to make a late payment. None of these employees produced evidence of payment, and they were not permitted to make a late payment.

Gifford states that, one day before she was discharged, she was told by her supervisor that he had been instructed to discharge her and that one of his superiors had stated that she would never again work for Santa Fe nor would anyone else by the surname of Gifford. Gifford never applied to be rehired.

Gifford filed a formal charge of discrimination with the EEOC on January 4, 1968. Prior to that, on December 6, 1967, she filed an informal charge with the EEOC, but neither Santa Fe nor the union knew of this charge until after she had been discharged.

II. *Discussion*

A. *The October 1, 1965 Collective Bargaining Agreement.*

Gifford claims that Santa Fe and the union discriminated against her on the basis of sex by entering into the collective bargaining agreement that became effective October 1, 1965, since that agreement deprived her of the right to refuse work orders outside of Bakersfield. She asserts that her resignations in 1966—and the resulting loss of seniority rights, vacation rights, and pass rights—were the result of this allegedly discriminatory agreement.

■ Gifford's claim is time-barred. At the time of her resignations, and also at the time she filed her charge with the EEOC, Title VII provided that "[a] charge . . . shall be filed within ninety days after the alleged unlawful employment practice occurred . . . ." 78 Stat. 260 (formerly 42 U.S.C. § 2000e–5(e)). Gifford's resignations occurred in 1966, but she did not file her charge with the EEOC until over a year and a half later, in January 1968.

Gifford argues that she filed a timely claim with respect to the collective bargaining agreement because she was the victim of a continuing violation. She says that her final discharge occurred within ninety days of the date she filed her discrimination charge, and that up until her last day of employment with Santa Fe, she continued to be affected by the allegedly discriminatory agreement. In a sense, Gifford did continue to be affected by the agreement in that, up until her last day of employment, she had reduced seniority rights, vacation rights, and pass rights because of it. But Gifford's injuries did not result merely because of the agreement's existence and so the agreement, in and of itself, cannot be the unlawful employment practice. Rather, the allegedly unlawful employment practices occurred when Gifford submitted her resignations because she did not wish to fulfill work orders given by Santa Fe pursuant to the terms of the collective bargaining agreement. These resignations occurred more than ninety days before the EEOC charge was filed.

B. *Promotion to Wire Chief.*

■ Gifford claims that she was not promoted to the position of wire chief because

of sex discrimination. Her attorney admitted at oral argument, however, that she never applied for such a promotion. Arguably, if Gifford never applied to be a wire chief, Santa Fe was never given the opportunity to discriminate or not to discriminate against her, and so could not be guilty of sex discrimination. On the other hand, the evidence does not preclude the possibility that it was Santa Fe's responsibility to initiate promotions to the position of wire chief. Gifford also argues that Santa Fe had made it clear that it would not promote women to the position of wire chief, and that she should not be penalized for foregoing a futile act. *See Boudreaux v. Baton Rouge Marine Contracting Co.,* 437 F.2d 1011 (5th Cir. 1971).

In any event, in the circumstances of this case, Santa Fe cannot be held liable for damages if it had indeed refused to promote Gifford to the wire chief position. As pointed out above, wire chiefs were required to perform certain types of equipment repair that necessitated the lifting of weight in excess of twenty-five pounds. At the time Gifford was employed by Santa Fe, California law prohibited women from lifting such weights. The Ninth Circuit subsequently held in *Rosenfeld v. Southern Pacific Company,* 444 F.2d 1219 (9th Cir. 1971), that state legislation could not justify discriminatory treatment of women in employment practices which conflicted with federal law. Thus, if Santa Fe had refused to promote Gifford in reliance on California law, Santa Fe would have violated Title VII. *Schaeffer v. San Diego Yellow Cabs, Inc.,* 462 F.2d 1002, 1005 (9th Cir. 1972). This does not mean, however, that Gifford would necessarily be entitled to the damages she demands. In *Schaeffer,* the Ninth Circuit held that an employer's good faith reliance upon state statutes could serve as a defense against employee damage claims in Title VII suits. The court found that once an employer had notice that the state statutes were probably invalid, reliance on such statutes could no longer be considered to be in good faith. *Id.* at 1007. In *Schaeffer,* the employer had notice of the district court's opinion in *Rosenfeld* and of new regulations promulgated by the Equal Employment Opportunity Commission rejecting such statutes. Such notice defeated the employer's good faith defense claim.

Here Gifford's employment terminated in December 1967. Under the regulations promulgated by the Equal Employment Opportunities Commission in effect in 1965–1969, the state legislation upon which Santa Fe relied could have been considered valid. *See Schaeffer,* 462 F.2d at 1007, n. 3. Moreover, the district court's opinion in *Rosenfeld,* 293 F.Supp. 1219 (C.D.Cal. 1968), was not issued until after Gifford terminated her employment with Santa Fe. In these circumstances, the court finds that Gifford would not have been entitled to damages had Santa Fe refused to promote her to wire chief. Therefore, her claim fails.

Gifford's contention that Santa Fe could have hired women as wire chiefs by allocating the lifting duties to other employees does not raise a genuine issue as to a material fact. Gifford has simply made a conclusory assertion unsupported by any facts.

### C. *Retaliatory Discharge/Refusal to Rehire?*

Gifford claims that in December 1967 she was discharged by Santa Fe and dropped from membership in the union in retaliation for opposing unlawful employment practices and for threatening to file a discrimination charge with the EEOC. She also claims that Santa Fe retaliated by refusing to rehire her after she was discharged.

Section 2000e–3(a) of Title 42 provides in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . or for a labor organization to discriminate against any member thereof . . ., because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this chapter.

Thus, this section protects two types of activity: opposition to discriminatory acts

(the "opposition" clause), and participation in the procedures provided by Congress for the protection of Title VII rights (the "participation" clause). *See Sias v. City Demonstration Agency,* 588 F.2d 692, 694 (9th Cir. 1978).

### 1. The Opposition Clause

■ Gifford asserts that she was discharged from Santa Fe and the union, and not rehired by Santa Fe, because she opposed the October 1, 1965 collective bargaining agreement as it deprived her of the right to refuse work orders outside of Bakersfield.

The threshold question is whether this opposition was protected activity under Title VII. In *Sias v. City Demonstration Agency,* 588 F.2d at 695, the Ninth Circuit held that: " 'When an employee reasonably believes that discrimination exists, opposition thereto is opposition to an employment practice made unlawful by Title VII even if the employee turns out to be mistaken as to the facts.' " Here, Gifford testified at a deposition that she believed that the October 1 agreement discriminated against women who were employed by Santa Fe at the time the agreement became effective. But she also testified that she did not believe that the agreement discriminated on the basis of sex as to women who were first employed by Santa Fe after October 1, 1965. This indicates that Gifford's opposition to the October 1 agreement was not based on a reasonable belief that the agreement was discriminatory. If the agreement discriminated against continuing female employees on the basis of sex, then logically it must also have discriminated against new female employees. Gifford's testimony indicates that she actually believed that the agreement prejudiced continuing employees regardless of their sex. In other words, as a continuing employee, she had certain expectations based on past practice, and she wanted those expectations protected by the October 1 agreement. Furthermore, the first time Gifford suggested that she might have been the victim of sex discrimination was in her letter of November 29, 1967. This letter was written over two years after the October 1 agreement went into effect and over a year and a half after her resignations. This long silence on the sex discrimination issue, at a time when she was actively voicing her opposition to the October 1 agreement, shows that her opposition to the agreement was not based on a belief that the agreement was discriminatory on the basis of sex.

Because Gifford's opposition was not protected activity under Title VII, she cannot state a claim under the opposition clause for retaliatory discharge or for retaliatory refusal to rehire.

### 2. The Participation Clause

Under the participation clause, with respect to the retaliatory discharge question, the threshold issue is again whether Gifford engaged in any protected activity that could have given rise to her discharges from Santa Fe and the union. Her filing of a formal discrimination charge with the EEOC was obviously a protected activity, but the charge was not filed until after her discharge and so could not have been the cause of her termination. Likewise, her filing of an informal charge with the EEOC on December 6, 1967 could not have given rise to her discharge since Santa Fe and the union were unaware of that charge until after her employment and union membership had terminated. The only action that was known to the defendants prior to Gifford's discharge and that could arguably qualify as a protected activity was her statement in the November 29 letter that she intended to file a charge with the EEOC.

■ The court holds that Gifford's statement of intent to file a charge merits protection under the participation clause. This is consistent with the EEOC's position that the threat to file a charge is protected activity. EEOC Compliance Manual (CCH) ¶¶ 6951, 7051 (the Compliance Manual does not distinguish between activity protected under the participation clause and activity protected under the opposition clause, a distinction which is logically useful but which

does not alter the ultimate result). Protecting such activity also is consistent with the purpose of the participation clause which is to protect employees who utilize the anti-discrimination tools provided by Congress in Title VII. The threat to file a charge is just one step removed from the actual utilization of the EEOC complaint procedure. Moreover, since the threat is a signal to the employer and the union that a charge is going to be filed, the threat should be protected so as to preclude an employer or a union from short-circuiting the employee's statutory protection against retaliation by effectuating the discharge prior to the actual filing of the EEOC complaint.

Gifford argues that Santa Fe retaliated against her by failing to ask the union to withdraw its discharge request after Santa Fe had sent Gifford the notice of pending termination. She also argues the union retaliated by refusing to withdraw its discharge request and accept her late tender of dues. As in many retaliatory discharge cases, there is no direct evidence of retaliatory motivation and the court is asked to infer such motivation from the facts. Gifford argues that Santa Fe's retaliatory motivation can be inferred because two other persons who failed to pay their dues in a timely manner were allowed to make a late payment and have the union's discharge request withdrawn. Gifford says that she was similarly situated to these employees and that since she was not treated in the same manner, Santa Fe must have been retaliating. The court, however, finds that Gifford has raised no genuine issue of material fact on this question. She was not similarly situated to the first of these employees since, unlike Gifford, he had actually paid the dues before the union filed its discharge request with Santa Fe. Furthermore, he was allowed to pay a special assessment late because he had received improper notice of the assessment. Gifford makes no claim that she was unaware that her union dues were in arrears. The second employee was permitted to continue working because of a shortage of printer clerks in the Bakersfield office in 1967. Since Gifford was also a printer clerk in the Bak-

ersfield office and was discharged in 1967, Gifford suggests that there may have been a shortage of printer clerks in her office when she was discharged and that she was not kept on because of her threat to file a charge with the EEOC. But Santa Fe asked the union to withdraw its request for discharge of the other printer clerk immediately after receiving the request and before acting upon it. Gifford, on the other hand, is complaining that Santa Fe failed to ask the union to withdraw the discharge request after Santa Fe had already acted on it, as Gifford's threat to file an EEOC charge was not made until after Santa Fe had sent her a notice of pending termination. Therefore, she was not similarly situated to this second employee. In any event, the union could not be held liable under Gifford's theory since Santa Fe was the party that allegedly should have acted to retain her as an employee.

With respect to the question whether Santa Fe retaliated against Gifford by refusing to rehire her after she was discharged, the court finds that summary judgment should be granted to Santa Fe. Gifford never applied to be rehired and so Santa Fe cannot be guilty of retaliation by failing to rehire her. Gifford argues that she knew that Santa Fe would not rehire her and again relies on *Boudreaux v. Baton Rouge Marine Contracting Co.*, 437 F.2d 1011 (5th Cir. 1971), to the effect that she should not be penalized for foregoing a futile act. She says that she knew an application would be futile because, one day before she was discharged, her supervisor told her that one of his superiors had stated that she would never again work for Santa Fe and neither would anyone else by the surname of Gifford. Accepting as true that this hyperbolic statement was made, does not demonstrate that it would have been futile for her to apply to be rehired.

THEREFORE, IT IS ORDERED that defendants be granted summary judgment.