Juanita E. REEDER–BAKER, Plaintiff,

v.

LINCOLN  NATIONAL
CORPORATION, Defendant.

Civ. No. F 86–26.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Dec. 9, 1986.

Ernest M. Beal, Jr., John S. Knight, Carol J. Bradley, Parrish, Knight & Beal, Fort Wayne, Ind., for plaintiff.

N. Reed Silliman, Lisa T. Hamilton, Baker & Daniels & Shoaff, Fort Wayne, Ind., for defendant.

## MEMORANDUM DECISION AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. The court heard testimony on November 3–6, 1986, and final arguments on November 10, 1986. The court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a), after having examined the entire record and after having determined the credibility of witnesses.

### FINDINGS OF FACT

Plaintiff, Juanita E. Reeder-Baker (Baker) is a black female. Baker was employed by defendant Lincoln National Corporation (Lincoln) from August, 1974 to August, 1985. Baker held various positions in the Data Center. She progressed from the entry level position of keypunch operator to various higher positions, until she was promoted to the position of Production Control Consultant, which she held from June, 1983 until August 22, 1985. During her tenure with Lincoln, Baker had superior technical skills, trained new people in the Data Processing Department, and was called on (not infrequently) to help solve computer-related problems. Baker was one of the most skilled employees in the P.C.U.[1] Baker's performance was reflected in merit and promotional salary increases which consistently placed her above other Lincoln employees in Fort Wayne, as well as employees in the Data Center.

As a Production Control Consultant, Baker worked in the Production Control Unit (P.C.U.). The P.C.U. is a relatively small area with approximately six computer terminals. The people who work in the P.C.U. are essentially problem solvers. When a computer program which is being used by another Lincoln employee hangs up, the Production Control analyists and consultants have the ability to enter that program and fix it. The P.C.U. employees often

---

1. One of Baker's former supervisors, Glen Wilkinson, characterized Baker as a loyal employee, a leader, and a high energy person. When Wilkinson voluntarily left Lincoln he recommended that Baker be given his job as production control manager.

become frustrated; they sometimes use profanity and have occasionally kicked chairs. There are times when there is nothing to do in the P.C.U. During these times, they talk about their personal lives, work, management, and various other things. To a greater or lesser degree nearly all of the P.C.U. employees participate in these discussions.

In their discussions about management it is not uncommon for the employees to be very critical and to use profanity.[2] While Baker participated in these discussions, she was not a ringleader. Baker's conduct did not disrupt the working environment at the P.C.U. at any time, including August 22, 1985, the date of her termination.[3]

In December, 1983, Baker became Administrative Assistant to David Allen (Senior Vice President of Administrative and Staff Services for Lincoln), after being recommended by Robert Ambrisco (Second Vice President, Director of the Data Center). Allen is the highest ranking Lincoln officer with direct responsibility for data processing operations. Allen offered temporary administrative assistantships to various minority and non-minority candidates to provide a first-hand management experience. Allen explained that while this position offered Baker significant opportunities for advancement, it carried with it significant risks; for example, the risk of immediate termination should Baker disclose confidential information. Allen told Baker that the assistantship would not be included in her 1984 evaluation.[4]

Baker's ninety-day assistantship with Allen, ending April 3, 1984, proved to be a great disappointment. During this time Baker made remarks about Lincoln's management and her dissatisfaction with the treatment that she had received as an employee. On numerous occasions during Baker's assistantship, Allen counseled with Baker and expressed his dissatisfaction with her behavior.[5] On April 3, 1984, Allen and Tom Lasley (Assistant Vice President of Systems Programming for the Data Center) met with Baker to discuss her assistantship. A memorandum was prepared covering Baker's "disruptive and devisive attitude toward Lincoln," and Baker's "public outbursts conveying her negative opinions." The memorandum also outlined a number of guidelines (i.e., do not disparage the Lincoln, cease disruptive behavior) which Baker was to follow. The memorandum also stated that Allen would not support Baker for any management position.

Lincoln provided its employees with annual performance evaluations. Baker's Oc-

---

2. Wilkinson testified that he encouraged open criticism to the extent that it might bring about improvement. Profanity and disparaging comments were not condoned. Nevertheless, P.C.U. employees referred to Henry Dill (director of operations at the Data Center) and Keith Dawson (manager of operations) by very vulgar names.

3. Lincoln's claim that Baker disrupted the work environment in the P.C.U. is not supported by the evidence. Wilkinson, Jan Brookhart, Denise Williams, and Sharon Kahlenbeck testified that Baker did not disrupt the P.C.U. The only testimony to the contrary (that was not second hand) was given by Larry Jackson and Keith Dawson who saw Baker in the P.C.U. briefly on August 22, 1985, when she was terminated. It is significant to the court that the only testimony that could be characterized as being in conflict with this conclusion did not come from any of Baker's co-workers, all of whom testified that Baker did not disrupt the working environment.

4. This factual determination has been made after careful scrutiny of other facts, the testimony of other witnesses, and the careful evaluation of the demeanor and credibility of those witnesses. The court is fully aware that Baker's testimony on this point directly conflicts with Allen's testimony. Baker is simply more believable. While Allen was generally credible the court does not believe that he informed Baker that her assistantship would be included in her 1984 evaluation. That Baker was told that the assistantship would not be considered is supported by the 1984 evaluation, which does not mention the assistantship. It is also supported by the fact that the Allen memo was not attached to Baker's evaluation until after she had complained about the discrepancy. It should also be noted that Tom Lasley, a Lincoln employee who attended the April 3, 1984 meeting, and would have been in a position to support Allen's version of what Baker was told on this point, was not called as a witness.

5. Allen counseled Baker about work related problems and personal problems. He also loaned Baker money so that she could pay her bills.

tober, 1984, annual performance evaluation stated that she was performing at a "high competent level," entitling her to the merit pay increase (5–7%) accompanying that level. The evaluation did not reflect the time Baker spent with Allen. After receiving this increase, Baker learned that her white co-workers had received higher ratings and larger (9–11%) pay increases.

Baker told her superiors as well as her co-workers that she felt that her race had affected her annual performance appraisal. Specifically, some time in late December or early January of 1985, Baker went to Henry Dill (Director of Operations at the Data Center) and indicated that the evaluation was racially motivated and that the company maintained two policies—"one for blacks and one for whites." Baker told Ambrisco the same thing. Ambrisco told Baker that her position was "ludicrous." Although Baker mentioned the discrepancy in her evaluation to her co-workers, she did not disrupt the P.C.U. work environment.

On January 14, 1985, Baker applied for the position of Operations Manager. Baker told her co-workers that she thought she would be denied the position because of her race. Baker also told Robert Ambrisco that she had applied for the position. Baker said that she would expect a proper explanation if she was refused the promotion, and further said that if a proper explanation was not given she would complain to the local Human Relations Commission.

Baker's application for Operations Manager was received on January 15, 1985. Anne Easterday (who works in Human Resources) interviewed Baker. On January 28, 1985, the "Job Post Applicant Register" showed that Baker was a final candidate (marked 01). Sometime after February 1, 1985, a change was made on the Job Post Applicant Register. The change reflected that Baker had an unsatisfactory employment record (marked 07), and disqualified Baker from continuing in the interview process. On February 4, 1985, after talking with Ambrisco and Dill, Easterday indicated on the "Job Post Interviewing Form" that Baker would not be referred for a final interview.[6]

On January 31, 1985, Dill issued a memorandum placing Baker on "permanent probation."[7] The memorandum stated that Baker had again disrupted the harmony of the P.C.U. by commenting about her intention to take action against the company if she was not selected for the position of Operations Manager. When Dill referred to disruption he was referring to Baker's complaints about Lincoln's racial policies. In a meeting on February 1, 1985, between Baker, Ambrisco and Dill, Ambrisco told Baker that she would be terminated immediately if she would not sign the probation document. On January 31, 1985, Dill also submitted an addendum to Baker's 1984 performance appraisal (the memo prepared by Lasley), reflecting the April 3, 1984 meeting between Allen, Lasley, and Baker, regarding Baker's administrative assistantship with Allen. Prior to placing Baker on permanent probation, Dill consulted with people from Lincoln's Human Resources Department and talked with Cathy Meeks and Mark Foust. Baker's probation prevented her from proceeding as a final can-

---

**6.** This form is different from the "Job Post Applicant Register," the form which was changed. This form contains Easterday's notes, which state that Baker was out "... to challenge management about their feeling that she is not manager material...." This is not necessarily directed at Baker's racial attitudes. The note was apparently written on January 24, 1985. As of January 28, 1985, Baker was still a final candidate. Thus, there is no connection between the note and Baker's promotional demise. The connection is between Easterday's conversation with Ambrisco and Dill and the conse-

quential change in the "Job Post Applicant Register."

**7.** The probation document stated that Baker was disparaging the "Lincoln and its policies." It stated that Baker's statement that "Lincoln had two policies—one for blacks and one for whites—" cannot be substantiated by facts. Dill testified that Baker was disparaging Lincoln's allegedly "biased" policies and was going to take action against the company and that that was why he had put Baker on probation.

didate for the position of Operations Manager.[8]

On February 12, 1985, Baker filed charges with the Fort Wayne Metropolitan Human Relations Commission (FWMHRC) and the United States Equal Employment Opportunity Commission (EEOC) asserting that she had been discriminated against on account of her race and color. On May 17, 1985, those charges were amended to include allegations that the acts also represented retaliation against Baker for her opposition to practices made unlawful by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–3(a).

Sandra Bruce (Lincoln's Affirmative Action Administrator) responded to Baker's charges on March 13, 1985 and June 7, 1985. Bruce stated that Baker's comments regarding her intention to take action against the company generated discussion among her co-workers sufficient enough to cause Mark Foust and Cathy Meeks to express to Dill concern that work was not "getting done." That statement was false.[9]

On July 31, 1985, the FWMHRC, having completed its investigation, issued a determination that there was probable cause to believe the charges were meritorious. Thereafter, Lincoln suggested to Baker that she remain away from work pending conclusion of the conciliation process. Conciliation proved unsuccessful. Thus, Baker returned to work on August 22, 1985.

When Baker arrived at work on the evening of August 22, 1985, she became aware that a trace had been placed on her terminal, and that the trace was causing her terminal, as well as a general use console, to display unusual messages. Baker was unable to perform ordinary tasks. Baker was amazed at the messages displayed on her terminal and she invited others in the P.C.U. to look at the impact the trace was having in an attempt to understand what was happening. While discovery of the trace caused some commotion in the P.C.U., the employees in that unit were able to get their work done. Any disruption was not caused by Baker's behavior, but rather, by the discovery of the unusual top secret trace.[10]

Larry Jackson (Baker's direct supervisor) and Keith Dawson (another supervisor) arrived at the P.C.U. shortly after discovery of the trace. Both Jackson and Dawson viewed the P.C.U. for a brief period. By this time, Baker was furious about the trace and she confronted her supervisors privately in a loud and abrasive manner. On numerous occasions Jackson had acted as a sounding board for Baker. Under the circumstances Baker's confrontation was reasonable. She indicated to Jackson that the company was retaliating against her, that the company had really "screwed up," and that she would use the retaliation as evidence in her lawsuit. During this confrontation Baker was hurling a computer printout in the air which she threatened to use as evidence. Jackson advised Baker to return to the P.C.U. and continue working and that he would attempt to have the trace removed.

---

8. It is true that Baker received a memo dated February 8, 1985 which informed her that she was "eligible to post for other positions." That, however, was after she had been marked 07 and therefore had no bearing on the practical effect of her probation.

9. Bruce admitted that the statement was false when confronted with facts exposed during Ivy McGown's (Fort Wayne Metropolitan Human Relations Commission Investigator) investigation of Baker's charges. Meeks and Foust were Baker's co-workers. McGown interviewed Meeks and Foust to check the validity of Dill's allegation (Dill told Bruce that Meeks and Foust had come to him). The interview was transcribed and Lincoln was represented. Meeks denied going to management at all. Foust denied ever telling Dill that Baker was slowing productivity.

10. Lincoln alleges that Baker's conduct disrupted the P.C.U. Baker's co-workers, however, who were present on the night of August 22, 1985, testified that she was not disruptive and that work was getting done. They testified that it was the discovery of the top secret trace that caused any disruption that had taken place. Their testimony is believable, particularly in view of the fact that none of them had ever encountered a top secret trace at Lincoln before.

Baker returned to the P.C.U. James Fiedler (who had put the trace on Baker's computer) was eventually contacted and removed the trace.[11] Ambrisco was contacted and arrived at the Data Center shortly thereafter. Jackson and Dawson told Ambrisco what had taken place and advised him that Baker should be sent home for the evening until matters could be worked out. Ambrisco summoned Baker to his office and told Baker that her conduct was in violation of her permanent probation. He then fired Baker.[12]

Baker was then escorted back to the P.C.U. where she was permitted to pack her belongings. In the presence of her peers Baker put her things into boxes. After Baker had packed her things, Dawson and Ambrisco went through the boxes to look for Lincoln materials. Baker requested that she be given her final paycheck. Ambrisco told her that she would have to return in the morning. Baker was then escorted from the Lincoln premises.

On January 15, 1986 Baker filed an additional charge with the EEOC. In that charge she claimed that she was discharged in retaliation for her opposition to practices made unlawful by Title VII of the Civil Rights Act of 1964, as amended, as well as on account of the proceedings which she had commenced thereunder.

Lincoln's Personnel Practices Manual provides that an employee may only be discharged without warning for serious and flagrant violations including gross misconduct. The Manual goes on to provide that no employee can be discharged without approval of the appropriate Human Resources service unit. It also provides that a written warning should be given to the employee prior to formal probation. Sim-

ilarly, the employee handbook provides that an employee may be terminated immediately for insubordination, willful negligence, refusing to carry out instructions, gross misconduct, and other serious wrongs. However, the employee handbook states that termination will not take place without thorough review and approval by Human Resources.

Lincoln has a well developed affirmative action program. In 1983 both the Lincoln National Corporation and Lincoln's Data Center employed a greater percentage of blacks (7.7% and 7.9% respectively) than other Fort Wayne area companies employed (6.1%). The same was true in 1984.

At the time of her discharge, Baker was earning $27,665.00 annually. She has accumulated lost wages of $25,665.49.[13] Prejudgment interest on those lost wages amounts to $1,043.76. Baker was unable to secure full time employment after her termination until May, 1986 when she began working at Physicians Health Plan where she receives a salary of $14,000 per year. While she applied for unemployment benefits, Lincoln successfully contested her claim.

Baker suffered emotional distress after her termination. At the time of her termination Baker was married and had two children. Baker's marriage, of approximately five months, ended in divorce within months after her termination. She was suddenly dependent upon her mother and father to support her. Her car was repossessed. Baker's two children began living with their grandmother. Baker later moved in with them. During this time Baker developed severe tension headaches

11. Barbara Auer testified that Fiedler put the trace on Baker's terminal by mistake. The trace is a visible check. Fiedler was asked to put Baker on audit mode, an invisible top secret check. Baker's computer was put on "top secret" trace by mistake.

12. Ambrisco testified that he fired Baker for violating her permanent probation; for disrupting the P.C.U. When asked how Baker had disrupted the P.C.U. Ambrisco testified specifi-

cally as to what Dawson and Jackson had told him. Ambrisco's deposition testimony was that he was not in the P.C.U. and could not testify as to what Baker had done.

13. This accounts for wages received from Kelly Girl Services and "Time Temporaries," as well as wages received from "Physicians Health Plan," but does not account for a 1985 wage increase.

and a nervous rash, both of which required medication.

Prior to her termination Baker had been a very independent person. The loss of independence caused by her termination brought about severe emotional reactions. She suffered from depression and was frequently tired. She was not as outgoing with people as she had been before her termination and was frequently unhappy.

## CONCLUSIONS OF LAW

The court has jurisdiction over the subject matter of this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and under § 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. The court has jurisdiction over the parties. Lincoln is an employer within the meaning of Title VII.

Baker has three claims: that Lincoln discriminated against her by giving her a smaller merit wage increase than similarly situated white employees; that Lincoln retaliated against her for opposing racial discrimination; and that Lincoln retaliated against her for her participation in Title VII proceedings. All three claims are based on the disparate treatment theory of discrimination. While plaintiff's claims are distinct and will be analyzed separately, they each share the analytical framework enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The *McDonnell Douglas—Burdine* paradigm involves a three-step procedure.

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093, *citing McDonnell Douglas Corp.,* 411 U.S. at 792, 93 S.Ct. at 1817. *Accord United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

This court cannot require Baker to submit direct evidence of Lincoln's discriminatory intent. *Aikens,* 460 U.S. at 714 n. 3, 103 S.Ct. at 1481 n. 3. "[C]ourts often must rely on circumstantial evidence of employer motivation in employment discrimination cases." *Hearn v. R.R. Donnelly & Sons Co.,* 739 F.2d 304, 306 (7th Cir.1984), *cert. denied,* 469 U.S. 1223, 105 S.Ct. 1214, 84 L.Ed.2d 356 (1985). Throughout the three-step procedure the plaintiff retains the burden of persuasion. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. "The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff. The district court must decide which party's explanation of the employer's motivation it believes." *Aikens,* 460 U.S. at 714, 103 S.Ct. at 1481.

When § 1981 is used as a parallel basis for relief with Title VII its elements are identical to Title VII. *Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38, 43–44 (2d Cir.1984); *Lincoln v. Board of Regents of University System,* 697 F.2d 928, 935 (11th Cir.1983), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983); *Pinkard v. Pullman Standard,* 678 F.2d 1211, 1224 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 954 (1983); *Flowers v. Crouch Walker,* 552 F.2d 1277 (7th Cir.1977); *Waters v. Wisconsin Steel Works of International Harvester Co.,* 502 F.2d 1309, 1316 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976); *Moffett v. Gene B. Glick Co., Inc.,* 621 F.Supp. 244, 282–83 (N.D.Ind.1985), *overruled in part on other grounds, Reeder-Baker v. Lincoln National Corporation,* 644 F.Supp. 983 (N.D.Ind.1986). Having reviewed the basic analysis underlying each of plaintiff's claims the court will now examine the merits of each claim.

## I.

### Merit Wage Increase

■ Plaintiff claims that Lincoln gave her a smaller merit wage increase than it gave similarly situated white employees because she is black. This claim arises out of Baker's 1984 performance evaluation. The evaluation stated that Baker was performing at a "high competent" level; her white co-workers received "commendable" ratings, entitling them to higher wage increases.

When an employer responds to a plaintiff's claim with a legitimate nondiscriminatory reason for the action taken, there is no reason to determine whether the plaintiff has actually made out a prima facie case. *Aikens,* 460 U.S. at 714–15, 103 S.Ct. at 1481–82; *Suson v. Zenith Radio Corp.,* 763 F.2d 304, 307 (7th Cir.1985); *Moffett,* 621 F.Supp. at 177. The court must simply proceed to the question of discrimination vel non—that is, whether the employer intentionally discriminated against the plaintiff. *McCluney v. Jos. Schlitz Brewing Co.,* 728 F.2d 924, 926 (7th Cir.1984). In the case at bar, Lincoln has given a legitimate nondiscriminatory reason for the difference in plaintiff's 1984 evaluation.

### A.

### Lincoln's Legitimate Nondiscriminatory Reason

Lincoln claims that Baker was given a lower performance evaluation (compared with her co-workers) in 1984 as a result of the assistantship with Allen.[14] At this stage in the analysis the employer must set forth the reason for plaintiff's treatment, but need not persuade the court that it was actually motivated by the proferred reason. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. There can be no doubt that Baker's time with Allen was a great disappointment to Allen and that Baker did not perform satisfactorily. To that extent Lincoln has successfully articulated a nondiscriminatory reason for the discrepancy in Baker's evaluation. The question is whether Lincoln's explanation is pretextual or unworthy of credence.

### B.

### Evidence of Pretext

■ The evidence shows that Lincoln's proferred reason is pretextual. Baker was told by Allen that the assistantship would not be included in her 1984 evaluation.[15] While there was testimony to the contrary the record supports Baker's testimony.

Baker's 1984 evaluation does not mention the time Baker spent with Allen. According to Sprague and Jackson (who with Dill's help performed the evaluation), Baker would have received a "commendable" rating like her co-workers, if they had not considered the ninety day assistantship. In spite of this, the 1984 evaluation itself contains no reference to Baker's assistantship;

---

**14.** Lincoln actually claims that plaintiff failed to establish a prima facie case because she was not similarly situated to her white peers, as a result of the time she spent with Allen. But the time with Allen was not included in her 1984 evaluation. Plaintiff easily establishes a prima facie case. She performed the same work as her five white peers. She belongs to a protected group, and she was treated less favorably. Contrary to Lincoln's assertions, Baker's prima facie case does not rely on statistical evidence. Baker compared herself to her peers not to show statistically that she established a prima facie case, but to show that similarly situated individuals were treated more favorably. The *McDonnell Douglas-Burdine* framework is a model for ordering and evaluating evidence; it does not prevent the trial judge from searching for evidence

of a legitimate nondiscriminatory reason in the evidence presented to establish a prima facie case. *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10; *Klein v. Trustees of Indiana University,* 766 F.2d 275 (7th Cir.1985). The evidence relating to Baker's time with Allen is more rationally related to the second phase of the analysis than the first and will therefore be considered in this section.

**15.** As pointed out in footnote 4, this court believes Baker's testimony over Allen's. This determination was made on the basis of credibility, and on the basis of supporting facts, particularly the 1984 evaluation itself, which does not mention Baker's time with Allen.

the evaluation contains no negative comments. It simply does not make sense that Lincoln's sole negative concern over the plaintiff's performance, her time with Allen, would not be included in the evaluation. The plaintiff's time with Allen was not a consideration in Baker's evaluation, but rather, was an after-the-fact justification of discriminatory treatment.

This conclusion is confirmed by the fact that the Allen memo was not made a part of Baker's evaluation physically until February 1, 1985, after Baker had complained about the discrepancy.[16] It is also confirmed by the undisputed fact that plaintiff had excellent technical skills, was often called on to solve problems, and performed her job better than her peers. It is further confirmed by the testimony of Sprague, who conceded that an important part of the evaluation process is feedback; a chance for the employee to respond to the evaluation. If Baker, with her exceedingly high technical skills, was rated "high competent" and not "commendable," and if the only reason for that rating was a ninety-day assistantship, some evidence that the assistantship was considered should have appeared on the evaluation. The preponderance of the evidence clearly establishes that the reason given by Lincoln for plaintiff's "high competent" rating is merely a pretext. Plaintiff has carried her burden of persuading the court that "a discriminatory reason more likely motivated" the defendant, *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, and plaintiff has prevailed on her first claim.

## II.

### *Retaliation for Plaintiff's "Opposition"*

■ Plaintiff's second claim is that Lincoln retaliated against her for speaking out against its employment practices. This claim arises out of Baker's complaint to Dill that Lincoln had two policies—one for blacks and one for whites—and Baker's

subsequent placement on permanent probation.

### A.

### *"Opposition" vs. "Participation"*

This claim is based on 42 U.S.C. § 2000e–3(a), which states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, *because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge,* testified, assisted, *or participated in any manner in an investigation, proceeding, or hearing under this subchapter.*

42 U.S.C. § 2000e–3(a) (emphasis added). This statute protects employees who "oppose" any practice made unlawful by this subchapter or employees who "participate" in an investigation, proceeding, or hearing under this subchapter. *See* B. Schlei & P. Grossman, *Employment Discrimination Law* 436 (1976). Whether an activity was "opposition" or "participation" is critical in Title VII retaliation cases. *Croushorn v. Board of Trustees of Univ. of Tenn.*, 518 F.Supp. 9, 20 (M.D.Tenn.1980). The "participation" clause is a subset of the "opposition" clause, covering a much narrower range of activity, but affording that activity stronger protection than is afforded activity covered by the "opposition clause." *See, e.g., Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir.1978); *Hearth v. Metropolitan Transit Commission*, 436 F.Supp. 685, 687 (D.Minn.1977).

---

**16.** Lincoln was not able to offer any believable reason for its failure to include in the 1984 evaluation some reference to the time spent with Allen. When asked about this Dill testified that he did not include any reference to Baker's time with Allen because he did not want to impede Baker's management opportunities. The court does not believe Dill on this point.

The "opposition" clause affords less protection than the "participation" clause because it contains two requirements that must be met before an employee can enjoy its protection. First, the form of the "opposition" must not be unlawful, *Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 374 (7th Cir. 1984), nor "excessively disloyal or hostile or disruptive and damaging to the employer's business." *Mozee*, 746 F.2d at 374; *Hoehstadt v. Worcester Foundation for Experimental Biology, Inc.*, 545 F.2d 222 (1st Cir.1976). Secondly, and most significantly, the employee must *reasonably believe* that the practice or policy he is opposing violates Title VII. *Jennings v. Tinley Park*, 796 F.2d 962, 966–67 (7th Cir.1986); *Rucker v. Higher Educational Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir.1982) ("It is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case."). With these important differences in mind the court now turns to the question: is plaintiff's second claim covered by the "opposition" clause or the "participation" clause?

Plaintiff received her evaluation on October 28, 1984. She complained to Dill about Lincoln's racial policies in late December, 1985 or early January, 1986. She posted for Operations Manager on January 14, 1985 and told Ambrisco that she had posted and would expect a proper explanation if she was refused the promotion; she further said that she would complain to the local human relations commission if she was not given a proper explanation. Baker also told her co-workers that she had applied for the position of Operations Manager.

Baker did not make it past the initial interview. On February 1, 1985 Baker learned that she had been placed on permanent probation. She filed her first charge on February 12, 1985. The court's inquiry must therefore focus upon whether the "participation" clause protects one who intends to file an EEOC charge, who communicates that intention to his employers and co-workers, and who actually does file the charge a few weeks later.

This question was addressed in *Croushorn v. Board of Trustees of Univ. of Tenn.*, 518 F.Supp. 9, 21–24 (M.D.Tenn. 1980), where the court afforded "participation" clause protection to a plaintiff who had not filed charges until the day after the retaliation. Reasoning that the "participation" clause was intended to protect all forms of access to the EEOC, the court held that the plaintiff deserved its protection since his conduct was an integral step in the process of making a formal charge. *Id.* at 23. Following the rationale of *Croushorn*, this court does not think that plaintiff's second claim is within the protection of the participation clause.[17] The filing of the charge in this case was more remote in time from the alleged retaliatory act. Moreover, in communicating her intentions not only to Lincoln's management, but also to co-workers, Baker was not merely forming an intention to file charges, but rather, was openly opposing Lincoln's racial policies.[18] Baker's conduct therefore falls within the broad scope of the "opposition" clause. Having decided that Baker is afforded "opposition" clause protection, the court now turns to the analysis of Baker's claim.

## II.A.(i)

### The Prima Facie Case

Retaliation claims brought under 42 U.S.C. § 2000e–3(a) follow the *McDonnell Douglas—Burdine* framework. *Jennings*, At 966–67; *Klein v. Trustees of Indiana University*, 766 F.2d 275, 280 (7th Cir.

---

**17.** *See Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir.1978) (comparison of two clauses); *EEOC v. Johnson Co.*, 18 F.E.P. 896 (D.Minn.1978) (extensive discussion of whether threat to file a charge with the EEOC constitutes participation).

**18.** *See Croushorn*, 518 F.Supp. at 23 n. 11, where the court notes that an employee's "opposition" to a practice is implicated when the employee openly communicates his intention. In these circumstances the employer retaliates because the employee's communication is more public— it has acquired a life of its own. The retaliation to some extent is motivated by the employer's reaction to what it perceives as hostile or disruptive behavior.

1985). To establish a prima facie case of retaliation the plaintiff must show that: "(1) [she] opposed an employment practice that was unlawful within the meaning of Title VII or [she] participated in a proceeding under Title VII; (2) [she] suffered an adverse action by [her] employer; (3) because of [her] opposition or participation." *Klein*, 766 F.2d at 280. The plaintiff must also show that the employer would not have taken the adverse action "but for" her opposition. *Id. See also McCluney*, 728 F.2d at 928. As noted earlier the plaintiff must also show a reasonable good faith belief that the challenged policy or practice violates Title VII. *Jennings*, At 966–67; *Rucker*, 669 F.2d at 1182. Of course, the plaintiff may ultimately be mistaken and still have a reasonable good faith belief. *Rucker*, 669 F.2d at 1182.

Baker has established a prima facie case. Baker opposed a company policy which she reasonably believed in good faith to be unlawful. She did this on two separate occasions. She went to management and complained about the discrepancy in her 1984 evaluation. She specifically asked Dill whether Lincoln had a policy for blacks and a policy for whites. She again expressed her opposition when she applied for Operations Manager and told management that she expected a good reason if she did not get the job. On both occasions she expressed her concerns to her co-workers. On both occasions she acted in good faith and with a reasonable belief that she was opposing unlawful practices.[19]

Lincoln took adverse action against Baker when it put her on "permanent probation." The court has no doubt that Dill placed Baker on permanent probation because she had opposed Lincoln's policies. "But for" her opposition she would not have been placed on probation. *McCluney*, 728 F.2d at 928. The sequence of events is telling. Baker complained about her evaluation and raised the issue of Lincoln's racial policies. Then she applies for the position of Operations Manager and again challenges Lincoln's policies. She was then put on "permanent probation." Beyond the sequence of events the memorandum placing Baker on probation draws a causal connection between her opposition and probation. Dill testified that Baker was put on probation for saying that Lincoln's policies were racially biased and for threatening to sue Lincoln. The memorandum, written by Dill (to whom she had complained about her 1984 evaluation), states in part:

> Juanita, you have again disrupted the harmony and working relationships within the Production Control Unit by commenting about your intentions to take action against the Company should you not be selected for the position for which you have posted. This conduct has brought about apprehension and uncertainty to the entire PCU work force. This conduct is also contrary to the instructions you were given in April by Mr. Allen. Those instructions were that you must not disparage the Lincoln and its policies and practices. Recently you stated to me and to Mr. Ambrisco that the Lincoln had two policies—one for blacks and one for whites—an accusation which cannot be substantiated by fact.

This memo itself establishes a causal connection. Baker complained about Lincoln's racial policies and was put on probation. The evidence clearly shows that there was no "apprehension" or "uncertainty" in the P.C.U. Under the standards enunciated in *Klein*, Baker has established a prima facie

---

**19.** Lincoln argues that Baker's own history (one of promotions) prevented Baker from having a good faith belief that Lincoln's policies were discriminatory. This argument can easily be turned on its head. Baker knew that she was very well qualified, which was evidenced by her employment history. Her co-workers testified that she was exceedingly capable. In Baker's mind, and in the court's view, Baker's employment history and technical qualifications make it all the more important for Lincoln to be able to give some nondiscriminatory reason for her 1984 evaluation discrepancy and her failure to get the operation manager's position. Lincoln's impressive affirmative action statistics do not preclude (while they are relevant) Baker's claim. Obviously, the fact that Baker prevailed on her race discrimination claim also lends support to the reasonableness of her belief.

case by a preponderance of the evidence, which gives rise to a rebuttable presumption of discrimination.

## II.A.(ii)

### Lincoln's Rebuttal

■ "To rebut the presumption of discrimination, the defendant must articulate a legitimate, nondiscriminatory reason for its actions." *Klein,* 766 F.2d at 280. The defendant's burden is only a burden of production; the plaintiff always carries the burden of persuasion. *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95. Lincoln asserts that Baker was placed on probation because she was expressing herself in an unacceptable way (by unacceptable means), because she was repeatedly disparaging Lincoln, because she was disrupting the P.C.U., and because she had violated the memorandum reflecting her time with Allen. This is clearly a legitimate [20] nondiscriminatory reason for placing Baker on probation.

The Seventh Circuit has recognized that employee conduct may be a legitimate reason for an employer's adverse action. In *Mozee v. Jeffboat, Inc.,* 746 F.2d 365, 374 (7th Cir.1984), the court stated:

> Of course, employees may not engage in conduct which is 'excessively disloyal or hostile or disruptive and damaging to the employer's business' and then claim the shield of § 704(a) [the opposition clause] as protection against adverse action.

Lincoln's articulated reason is therefore sufficient to rebut the presumption of discrimination. The real question is whether the reason given by Lincoln for putting Baker on probation is pretextual or not worthy of credence.

## II.A.(iii)

### Pretext

There is overwhelming evidence that Lincoln's articulated reason for placing Baker on permanent probation was pretextual and that Lincoln retaliated against Baker to silence her opposition. Lincoln's proferred explanation is simply not worthy of credence. *See, e.g., Klein,* 766 F.2d at 280–81. First, and most importantly, virtually all of Baker's co-workers who testified said that Baker did not disrupt the P.C.U. or impede productivity. Indeed, a former supervisor, Wilkinson, testified that Baker was loyal to Lincoln. Lincoln did absolutely nothing at trial to substantiate its claim that Baker had disrupted the P.C.U. or disparaged the Lincoln in the P.C.U.[21] That fact strikes an enormous blow to Lincoln—it simply cannot maintain that plaintiff's probation resulted from any disruption in the P.C.U.

Lincoln's only evidence of disruption in the P.C.U. turned out to be false at trial. In response to Baker's EEOC charges, Bruce (Lincoln's Affirmative Action Administrator) indicated that two of Baker's co-workers expressed to Dill a concern that work was not getting done because of Baker's comments. Fort Wayne Metropolitan Human Relations Investigatory Ivy

---

**20.** *Jennings,* At 966–67, suggests that a reason may be nondiscriminatory and illegitimate, and thus distinguishes those words and requires that employers articulate a legitimate reason that is also nondiscriminatory. The court goes on to cite *EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1014 (9th Cir.1983), for the proposition that almost every form of opposition to an employment practice is in some sense disloyal, so that disloyalty in and of itself is not necessarily a legitimate basis for action, although it is nondiscriminatory. The court recognizes this tension and holds that Lincoln's nondiscriminatory reason is legitimate.

**21.** The court acknowledges that Baker criticized management and used profanity in the P.C.U. But it was made perfectly clear that nearly all of the P.C.U. employees did the same. In closing argument Lincoln's counsel conceded that Lincoln had produced no witnesses during trial (who worked with Baker) who testified that Baker disrupted the P.C.U. Counsel took the position that Lincoln had no burden to persuade the court of anything. While it is true that the plaintiff always retains the burden of persuasion in a Title VII case, it is also true that this court (as it usually is) has been forced to decide whether it believes Lincoln's articulated reason for its action. With virtually no testimony to

McGown interviewed those co-workers.[22] One denied going to Dill at all. The other denied ever saying that Baker was slowing productivity. When confronted with McGown's findings Bruce admitted that Lincoln's position in its response was false. This is further evidence of pretext.

Additional evidence of pretext surrounds Baker's posting for the Operation Manager's position. Baker had threatened to take further action if she was denied the job and was not given a good explanation. Baker was listed as a final candidate on the "Job Post Applicant Register" on January 28, 1985, but was disqualified from continuing in the interviewing process some time after February 1, 1985, after Easterday had talked to Ambrisco and Dill, and after Baker had been placed on probation. Ambrisco and Dill told Easterday to disqualify Baker. Baker was disqualified from the interviewing process because she was on probation as a result of Lincoln's retaliation against her.[23]

With respect to Lincoln's claim that Baker was disparaging the company, the evidence shows only that Baker was complaining to management about Lincoln's racial policies and that Baker was partaking in discussions with co-workers which were critical of management. The court has balanced Baker's right to speak to management about its policies with any effect that Baker's attitudes or conversations had, *see, e.g., Mozee,* 746 F.2d at 374, and concludes that Baker's actions were within the protection of the "opposition" clause, and that Lincoln's attempts to characterize Baker's actions as "excessively disloyal," "hostile," or "disruptive," are simply not supported by the evidence. In short, Baker has satisfied this court by a preponderance of the evidence that Lincoln's explanation for placing Baker on permanent probation is pretextual and not worthy of credence and that Baker was put on probation in retaliation for her opposition to Lincoln's racial policies.

### III

### *Retaliation for Plaintiff's "Participation"*

■ Plaintiff's final claim is that Lincoln retaliated against her for participating in Title VII proceedings. Plaintiff filed charges on February 12, 1985 and filed an amendment on May 17, 1985. She was fired on August 22, 1985. Plaintiff's "participation" claim shares the *McDonnell Douglas—Burdine* analysis enunciated earlier.

the contrary at trial, this court cannot hold that Baker disrupted the P.C.U.

**22.** Lincoln strenuously objected to McGown's testimony regarding what Meeks and Foust had said as being without the scope of Fed.R.Evid. 803(8)(C). This court has carefully considered its responsibility to try the case *de novo,* the usefulness of the testimony, and the possibility of prejudice or delay caused by the testimony. *See Tulloss v. Near North Montessori School,* 776 F.2d 150, 154 n. 2 (7th Cir.1985). Contrary to Lincoln's objection it was not denied a trial *de novo.* McGown's testimony was one factor among many considered by the court. In view of the important factual dispute regarding what Meeks and Foust actually told Dill, in view of the undisputed fact that Lincoln was represented at the time the testimony was given, and in view of the fact that the testimony was transcribed, the court holds that McGown's testimony is admissible. Under the circumstances the testimony was exceedingly reliable and many of

the reasons for the hearsay rule were not even present. Moreover, Lincoln could easily have called Meeks and Foust to testify if they had a good faith belief that McGown's testimony was false.

**23.** At trial Lincoln took the position that Baker was not disqualified because she was placed on probation. That position is important to Lincoln because if Baker's probation had the effect of preventing her from posting, then it was not only harsh in that it was permanent, but also in that it impeded Baker's aspirations to management, a thing that was peculiar to Baker's probation. Assuming Baker's probation did not affect her posting, then discriminatory motives did. There is virtually nothing in the record to indicate that anything in Baker's file changed (with regard to her qualifications) after January 28, 1985. The only significant event was Easterday's conversation with Ambrisco and Dill, the same people who Baker had previously raised Lincoln's racial policies with.

## A.

### The Prima Facie Case

The same standards govern a "participation" prima facie case that govern an "opposition" case, except that plaintiff's belief does not have to be reasonable. *See Croushorn,* 518 F.Supp. at 25, and cases cited therein. Plaintiff must show that: "(1) [she] opposed an employment practice that was unlawful within the meaning of Title VII or [she] participated in a proceeding under Title VII; (2) [she] suffered an adverse action by [her] employer; (3) because of [her] opposition or participation." *Klein,* 766 F.2d at 280. Obviously, Baker had participated in a Title VII proceeding (in which she received a probable cause finding) and was fired thereafter on August 22, 1985. The only remaining question is whether she was fired because of her participation, or would not have been fired "but for," *McCluney,* 728 F.2d at 928, her participation.

Baker's termination was a direct result of her participation in Title VII proceedings; "but for" the filing of her charges she would not have been fired. Absolutely nothing took place between February 1, 1985 and August 22, 1985, other than the filing of her charges, that could have effected Baker's termination. Dill testified that Baker had not violated the terms of her probation during that period. Baker was terminated because she had participated in Title VII proceedings.

## B.

### Lincoln's Rebuttal

■ Lincoln's proferred explanation is that Baker was fired for insubordination and for violating her probation. Since Baker's probation was unlawful, a violation of her probation is not a legitimate reason for her discharge. The court will assume, however, that Lincoln has offered a legitimate nondiscriminatory reason for plaintiff's discharge and will turn to the question of whether that explanation is pretextual.

## C.

### Pretext

Lincoln claims that plaintiff was fired for violating her probation, for displaying a "negative attitude" in the P.C.U. and for "disruptive action." As noted in the Findings of Fact, Baker was amazed when she discovered the "trace" which Lincoln had placed on her computer, and was unable to perform her ordinary tasks. It is undisputed that Baker was furious about the trace. She confronted Jackson and Dawson privately and indicated that Lincoln had really "screwed up." This confrontation was part of her participation in Title VII proceedings. Most importantly, Baker's co-workers testified that she had not disrupted the P.C.U. on the night of August 22, 1985, nor at any time between February 1, 1985 and August 22, 1985.

Lincoln's proffered reason for firing Baker is simply pretextual. Baker's response to the "trace" was reasonable; her anger was motivated in part by the fact that she could not get her work done. Employers "should not be able to make things so miserable for an employee that performance suffers, and then be able to use that which is the employer's fault as a justification for terminating an employee who has complained of the employer's actions." *Moffett,* 621 F.Supp. at 281. Lincoln admits that the top secret "trace" was put on the computer by mistake. Nevertheless, it jumped at the very first opportunity it had to use Baker's reasonable reaction to its own mistake to get rid of Baker.

Baker can hardly be fired for "insubordination" when she complained to Jackson about the trace. Jackson had invited Baker on numerous occasions to use him as a "sounding board." That is exactly what she did. While Lincoln claims that she carried her criticism into the P.C.U., the testimony of its own employees, who were present on that night, does not support its claim. Lincoln's claim that Baker was fired for "insubordination" is not worthy of credence. Under the circumstances, it is more likely that Baker was fired because she had filed charges.

The cursory termination decision made by Ambrisco is further evidence that Lincoln was eager to get rid of Baker at its first opportunity. Dill testified that Baker had done nothing in violation of her probation from February 1, 1985 to August 22, 1985. Without contacting Human Resources (in violation of the Employee Handbook), Ambrisco fired Baker after talking with Jackson and Dawson and after meeting with Baker for a matter of five to ten minutes. It should be kept clearly in mind that Ambrisco is the same person who responded to Baker's complaint that Lincoln had two racial policies by saying, "that is ludicrous." It should also be noted that Baker's termination took place on August 22, 1985, the first day she had returned to work, after having been away from work during the conciliation process. In spite of a recommendation from Jackson and Dawson that Baker be sent home, Ambrisco fired her. This court simply does not believe that she was fired for insubordination or for violating the terms of her probation.

This court is well aware of *Bohen v. City of East Chicago, Indiana,* 622 F.Supp. 1234 (N.D.Ind.1985), *aff'd in part, rev'd in part on other grounds,* 799 F.2d 1180 (7th Cir.1986). Baker simply was not fired because she lacked respect for authority, or because she refused to follow instructions. She was not discharged for having a personality that created conflict. *See Kellner v. General Refractories Co.,* 631 F.Supp. 939, 946 (N.D.Ind.1986). She was not fired for disrupting the P.C.U., or for interfering with the attainment of Lincoln's goals. *See Unt v. Aerospace Corp.,* 765 F.2d 1440, 1446 (9th Cir.1985). She was fired because she had vigorously pursued her Title VII remedies.

## IV

### Remedies

■ Having determined liability in plaintiff's favor on all three claims, the court now turns to the question of appropriate monetary relief. Plaintiff seeks back pay, prejudgment interest, compensatory damages, punitive damages, reinstatement (or front pay), and attorneys fees and costs.

### A.

### Back Pay

Lost wages are recoverable under both Title VII and § 1981. *See Albermarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (Title VII); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975) (§ 1981); *Perry v. Hartz Mountain Corp.,* 537 F.Supp. 1387, 1389 (S.D.Ind.1982) (wrongful discharge). The liability established by plaintiff entitles her to an award of back pay. *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Hunter v. Allis-Chalmers Corp., Engine Div.,* 797 F.2d 1417, 1425 (7th Cir. 1986). Plaintiff's total wage loss is $25,665.49.[24]

### B.

### Prejudgment Interest

Interest on wages that are due and owing is an available remedy to a plaintiff in a Title VII case, and can be awarded in the discretion of the trial court. *Hunter,* 797 F.2d at 1425–27; *Taylor v. Phillips Industries, Inc.,* 593 F.2d 783, 787 (7th Cir.1979). Such an award makes the plaintiff whole by reimbursing her for the lost use of the money to which she was entitled. The court finds that an award of prejudgment interest is justified in this case.

There have been a wide variety of methods employed in determining the rate of prejudgment interest for Title VII cases. *See EEOC v. Wooster Brush Co. Employ-*

---

**24.** This figure was taken from plaintiff's Exhibit # 28A, which properly accounts for wages received from other sources. Defendant conceded that Baker had used reasonable diligence to mitigate her damages. *See* 42 U.S.C. § 2000e–5(g) and *Hanna v. American Motors Corp.,* 724 F.2d 1300, 1307 (7th Cir.1984).

*ees Relief Association,* 727 F.2d 566, 579 (6th Cir.1984), and cases cited therein. This court follows the methodology set forth in *Dependahl v. Falstaff Brewing Co.,* 653 F.2d 1208 (8th Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). That case, involving a violation of the ERISA statute, held that the rate of prejudgment interest is a question of federal law when the cause of action arises from a federal statute, *id.* at 1218, and found that the federal statute for postjudgment interest, 28 U.S.C. § 1961, was the most appropriate statute from which to calculate the rate of prejudgment interest. That statute computes the rate of interest as the:

> rate equal to coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty two week United States Treasury bills settled immediately prior to the date of the judgment.

That rate is currently 5.77%, and thus Baker will be awarded prejudgment interest at that rate. Given the amount of back wages due, the court finds the total amount of prejudgment interest to be $1,043.76.[25]

### C.

### *Compensatory Damages for Emotional Distress*

Compensatory damages for humiliation and emotional distress suffered by an employee subject to discrimination are recoverable.[26] *Johnson v. Railway Express*

*Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). *See also Ramsey v. American Air Filter Co., Inc.,* 772 F.2d 1303, 1313 (7th Cir.1985), and cases cited therein.

Baker suffered emotional distress as a result of Lincoln's retaliatory actions. At the time of her termination Baker was married and had two children. Baker's marriage, of approximately five months, ended in divorce within months after her termination. She was suddenly dependent upon her mother and father to support her. Her car was repossessed. Baker's two children began living with their grandmother. Baker later moved in with them. During this time Baker developed severe tension headaches and a nervous rash, both of which required medication.

Prior to her termination Baker had been a very independent person. The loss of independence caused by her termination brought about severe emotional reactions. She suffered from depression and was frequently tired. She was not as outgoing with people as she had been before her termination and was frequently unhappy. She also suffered the humiliation of having Ambrisco go through her boxes on the night of her discharge. On these facts, an award of $10,000.00 is appropriate to compensate Baker for the humiliation and emotional distress she suffered.

### D.

### *Punitive Damages*

The award of punitive damages in civil rights cases is governed by federal law.

---

**25.** This amount represents the interest accrued through monthly compounding of the interest generated by the amount of wages due. The court calculated the monthly balance of wages due beginning August 1985 until October 1986, and computed the interest due at the end of each month, adding that interest to the monthly balance due. The $1,043.76 figure represents the sum of the interest amounts so generated.

**26.** Lincoln argued that Baker could not recover § 1981 compensatory damages if she only prevailed on her retaliation claims, since a recovery for retaliation would lack the discriminatory intent requirement under § 1981. While this argument has been mooted by plaintiff's success

on her race discrimination claim (merit wage claim), the court points out that Lincoln's position on this issue is erroneous. Intentional discrimination is required under § 1981, *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 510 (7th Cir.1986), but a plaintiff who prevails on a retaliation claim necessarily also proves intentional discrimination. *See Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38, 43 (2d Cir.1984), and cases cited therein. The discriminatory intent requirement of § 1981, *Minority Police Officers Association v. City of South Bend,* 801 F.2d 964, 967 (7th Cir.1986), is satisfied when a plaintiff prevails on a retaliation claim.

*Lenard v. Argento,* 699 F.2d 874, 890 (7th Cir.1983). Punitive damages may be assessed when the defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Equally important, however, is the fact that punitive damages are designed to punish the defendant for its outrageous conduct and to deter it and others from engaging in similar conduct. *Ramsey v. American Air Filter Co., Inc.,* 772 F.2d 1303, 1314 (7th Cir.1985).

If a jury (or other fact-finder) makes a moral judgment that the policies of punishment and deterrence would be served by an award then punitive damages are appropriate. *McKinley v. Trattles,* 732 F.2d 1320, 1326 (7th Cir.1984). To warrant an award of punitive damages, it must be demonstrated that "there was a degree of willful and wanton disregard of plaintiff's rights not to suffer this sort of discrimination." *Seaton v. Sky Realty Co., Inc.,* 491 F.2d 634, 638 (7th Cir.1974). *See also Jade Tolliver v. Amici,* 800 F.2d 149, 151 (7th Cir. 1986).

In *Hunter v. Allis-Chalmers,* 797 F.2d at 1425, the Seventh Circuit upheld an award of $25,000 in punitive damages to a victim of racial harassment.

> The award of $25,000 in punitive damages was also within reason. The jury found that Allis-Chalmers had deliberately fired a worker for making well-founded complaints about persistent acts of racial harassment sparked off by the fact that he worked much harder for Allis-Chalmers than most of his white co-workers. *It is not easy to say what would be the right amount of punishment for this deliberate wrongdoing by a large enterprise but it is easy to say that $25,000 was not too much.* (Emphasis added).

While Baker was not the victim of harassment, an award of punitive damages is necessary in this case to punish Lincoln for its callous disregard of Baker's right to oppose racial policies which she reasonably believed were unlawful and to participate in Title VII proceedings without being retaliated against. Punitive damages are also necessary to deter others from engaging in similar conduct.

Lincoln is a very large and sophisticated corporation with well developed affirmative action policies. Nevertheless, some of its managers had no regard for Baker's civil rights. When Baker opposed Lincoln's racial policies she was put on permanent probation. The memorandum placing Baker on probation shows a willful and wanton disregard for her right to oppose policies which she reasonably believed were unlawful. Baker was then fired for participating in Title VII proceedings. She had received a favorable probable cause determination and it was clear to Ambrisco that she was pursuing her Title VII remedies. Nevertheless she was summarily fired for pretextual reasons, despite the recommendation of her immediate supervisors, and in a way that violated Lincoln's own employment policies. Lincoln's actions involved callous indifference to Baker's rights. Dill testified that Baker had not done anything to violate her probation from February 12, 1985 to August 22, 1985; she was fired anyway ... because she pursued her Title VII remedies.

Retaliation by itself would obviously not automatically justify punitive damages. This case involves more than retaliation. This case involves callous indifference to Baker's rights. To deter this sort of conduct in the future, plaintiff is entitled to a punitive damage award of $25,000.

### E.

### *Reinstatement—Front Pay*

Appropriate relief under Title VII may include reinstatement. 42 U.S.C. § 2000e–5(g). In this case reinstatement which is desired by the plaintiff but not by Lincoln, would not be appropriate. Front pay may be awarded when the "antagonism between employer and employee is so great that reinstatement is not appropriate." *Fadhl*

*v. City and County of San Francisco,* 741 F.2d 1163, 1167 (9th Cir.1984). Front pay is designed to make an employee whole for a reasonable future period, required for an employee to re-establish her rightful place in the job market. *Dillon v. Coles,* 746 F.2d 998, 1006 (3d Cir.1984).

In this case an award of front pay is necessary to make Baker whole. While Baker has obtained employment, she is making much less than she was at Lincoln at the time of her termination. Hence, an award of front pay, covering a period of two years from November 3, 1986, in the amount of $26,760 [27] is necessary to make Baker whole.

### F.

#### Attorneys Fees and Costs

Baker is also entitled to her reasonable attorneys fees, 42 U.S.C. § 2000e–5(k); 42 U.S.C. § 1988, and her reasonable costs. 28 U.S.C. § 1920. The considerations relevant to computing a reasonable attorney's fee award have been set forth by the United States Court of Appeals for the Seventh Circuit in *Waters v. Wisconsin Steel Works,* 502 F.2d 1309 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). Baker has not submitted a request for fees detailing the amount her attorney seeks under these provisions, and thus the court cannot enter an order setting forth the amount of the award. Plaintiff will be ordered to submit a motion to the court within twenty (20) days from the date of this order setting forth detailed information justifying her request for fees.

#### Conclusion

This memorandum of decision contains the court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1183–84 (7th Cir.

1982). Baker has established by a preponderance of the evidence that Lincoln discriminated against her because of race, that Lincoln retaliated against her when she complained about the discrepancy in her 1984 evaluation, and that Lincoln retaliated against her for participating in Title VII proceedings, all in violation of Title VII and § 1981. Defendant is ORDERED to pay the plaintiff $25,665.49 for lost wages; $1,043.76 for prejudgment interest on those wages; $10,000.00 for emotional distress; $25,000 for punitive damages; $26,760 for front pay; and reasonable costs and attorneys fees. Plaintiff is ORDERED to file a motion for fees and costs within twenty (20) days from the date of this order, detailing her request for fees and costs.

---

**27.** This figure was arrived at by taking the difference between Baker's salary at Lincoln at the time of her termination, assuming a 10% increase for a commendable rating, of $27,830.00, and subtracting her current salary of $14,000 for an annual difference of $13,380 which was then multiplied by two, to arrive at the $26,760 figure. Given the difference in Baker's present salary two years is a conservative estimate of the time needed to make Baker whole. The two-year period begins when the period for back wages ends.