**Leon WEISS and Timothy Engel, Plaintiffs,**

v.

**PARKER HANNIFAN CORPORATION, Defendant.**

**Civ. A. No. 85–5836(JFG).**

United States District Court, D. New Jersey.

Sept. 26, 1990.

Bruce G. Cassidy, Desaretz & Cassidy, Haddonfield, N.J., for plaintiff Leon Weiss.

Barry F. Penn, Cherry Hill, N.J., for plaintiff Timothy Engel.

Bruce G. Hearey, Nancy A. Shaw, Spieth, Bell, McCurdy & Newell, Cleveland, Ohio, Wendy L. Mager, Smith, Stratton, Wise, Heher & Brennan, Princeton, N.J., for defendant Parker Hannifan Corp.

## OPINION

GERRY, Chief Judge.

The plaintiffs, Leon Weiss and Timothy Engel, brought this suit against the defendant, the Parker Hannifan Corporation, for claims of employment discrimination under Title VII, 42 U.S.C. § 2000e et seq., and the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 et seq. Weiss has brought a claim involving his failure to receive a promotion allegedly due to his religion. Both plaintiffs allege that their employment was terminated by Parker Hannifan in retaliation for their complaints about or opposition to the prior alleged discrimina-

tion against Weiss. The plaintiffs seek damages for back pay and front pay, as well as punitive damages.

The case was tried before the court on May 14–17, 1990, and the court now issues its findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Weiss and Engel were employed as warehousemen by Parker Hannifan at the defendant's distribution service center in Trenton, New Jersey at all times relevant to this case. Weiss, who is Jewish, began working at the warehouse in March 1982 as a temporary employee, and he became a full time Parker Hannifan employee in September 1982. Engel began working at the warehouse in October 1983. From 1982 until the time of his termination in 1985, Weiss was the only Jewish warehouseman in the defendant's Trenton facility.

Parker Hannifan is an Ohio corporation that manufactures original components and replacement parts for hydraulic and pneumatic systems used in the industrial, automotive, aerospace, marine and medical fields. Parker Hannifan's Trenton facility is the largest of a network of distribution service centers which supply the defendant's products to distributors who in turn sell them to the ultimate users. The functions performed at the distribution service centers include warehousing, hose fabricating and shipping. A manager runs each distribution service center, and he is the highest level employee at each respective center. The manager reports directly to Parker Hannifan's manager of physical distribution in Cleveland, Ohio. During the relevant period, Thomas Dickerson was the manager of physical distribution.

A leadperson or group leader reports to the distribution center manager, and the leadperson is responsible for distributing orders, routing freight and assigning employees to the various tasks in the warehouse. He also arranges for temporary employees and schedules overtime, subject to the manager's approval. The leadperson is a warehouse employee, and he received a 25 cents per hour salary premium at the time relevant to this case. Although the leadperson has the authority to assign tasks and oversee work, he does not have the authority to hire, fire or otherwise discipline employees. While there is a designated person in charge of the hose fabrication shop in the warehouse, the leadperson still generally oversaw the hose fabrication work during the relevant period.

When Weiss began working at Parker Hannifan, Keith Fennell was the distribution service center manager. Sometime in early 1984, Fred Schmidt became the leadperson at the Trenton center. Schmidt was selected for the job over Weiss. Schmidt had been a full time Parker Hannifan employee longer than Weiss, although Weiss actually began working in the Trenton facility as a temporary employee before Schmidt was hired. With the exception of Schmidt, Weiss was the senior warehouseman in Trenton throughout the relevant period. During 1984 and early 1985, Weiss trained most or all of the new warehousemen, including Engel and Robin MacNeal. When Schmidt or the prior leadperson was away from the facility, Weiss was the acting leadperson, and he assumed all of the responsibilities of that position. Prior to February 1985, MacNeal never served as leadperson, even on a temporary basis.

At the Trenton distribution service center, the hose fabrication shop operated independently of the other warehouse functions. In the hose fabrication unit, components were put together into hose assemblies and shipped to customers. In contrast, the warehouse merely stored the components, and the parts were shipped to customers who would fabricate the hose assemblies themselves. While the workers in the hose fabrication shop were technically warehousemen, they worked separately from the employees doing the general warehousing functions of receiving, packaging and shipping orders. Throughout the relevant time, one employee was designated the coordinator of the hose fabrication unit, and he was under the general authority of the warehouse leadperson. The employees who were assigned to the general warehousing function often worked in the hose fabrication shop when

there were many orders to fill or if there was a shortage of manpower for some reason.

While they were never full time hose fabrication employees, Weiss and Engel worked in the hose fabrication unit occasionally, and they both could do all of the tasks expected of a hose fabrication employee. Weiss even had experience in all of the responsibilities of the hose fabrication coordinator while he worked at Parker Hannifan. When the hose fabrication shop opened at the Trenton facility, Schmidt was the first hose fabrication coordinator. After Schmidt's promotion to leadperson in 1984, MacNeal became the hose fabrication coordinator. While MacNeal was in charge of the hose fabrication shop, various hose assemblies were returned to the defendant from unsatisfied customers. There was testimony that some orders would be returned to the shop and even the warehouse itself due to customer complaints no matter who was in charge at the time the orders were filled, although Schmidt testified that an unusually large number of orders were returned to the hose fabrication unit once MacNeal became the coordinator.

In September 1984, George Altmeyer replaced Fennell as manager of the distribution service center. Prior to his assignment in Trenton, Altmeyer had been the distribution service center manager at the defendant's facility in Atlanta, Georgia. Dickerson, the manager of physical distribution, moved Altmeyer from Atlanta to Trenton because Altmeyer was the defendant's "best" manager in Dickerson's estimation and because the Trenton facility had become Parker Hannifan's largest distribution service center. Until late November 1984, Altmeyer spent half of his time in the Trenton facility and the other half in Atlanta making preparations to move his family and himself to New Jersey. Altmeyer began working full time in the Trenton warehouse around the beginning of December 1984.

In January 1985, Schmidt accepted a sales position with Parker Hannifan, so he left his job as warehouse leadperson. Under an understanding he had with the defendant's regional sales manager, Schmidt did not tell any of his fellow employees that he would be leaving his position as leadperson until after an official announcement was made in late January 1985. In order to fill the leadperson vacancy, Altmeyer interviewed Weiss, Engel and MacNeal, as well as Jerry Lawton, another warehouseman. Altmeyer conducted the interviews after Schmidt had expressed concern to Altmeyer about rumors that MacNeal had already been selected as leadperson. In fact, MacNeal confirmed at trial that he had told Schmidt that Altmeyer had offered him the promotion prior to the interviews. Altmeyer testified that he did not discuss the promotion with any candidates before the interviews. Schmidt told Altmeyer that Weiss was the most qualified person for the job of leadperson in his opinion, but Altmeyer testified that he gave Schmidt's recommendation little weight.

During their interviews, each candidate expressed an interest in the position of leadperson, although MacNeal initially expressed some reluctance due to the added responsibility. Engel told Altmeyer that he wanted the promotion but that Weiss was better qualified to be leadperson. MacNeal testified that Weiss knew the warehousing function better than he did since MacNeal had worked mainly in the hose fabrication shop. In addition to the interviews, Altmeyer looked at Weiss's and MacNeal's personnel files. Following his review of the candidates' qualifications, Altmeyer chose MacNeal for the position of leadperson, and he announced his decision at a meeting of the distribution service center employees on Monday, February 4, 1985. MacNeal is not Jewish. Altmeyer told MacNeal that he had received the promotion on the prior Friday, February 1.

Altmeyer testified that he used three criteria to decide who would receive the position as leadperson. First, he testified that he considered the candidates' attendance records. During 1984 and January 1985, MacNeal missed less work than the other three candidates. In that time, MacNeal worked an average of 49.84 hours per week, while Weiss worked 48.71 hours per

week. Altmeyer testified that the leadperson had to be present in the warehouse during normal business hours (i.e., not overtime) in order to be effective and that MacNeal had better attendance during those hours than Weiss. Presence during normal business hours is important because trucks arrive to deliver and to take away shipments and customers contact the warehouse only during those hours. Weiss had to leave work unexpectedly and urgently on a few occasions in order to take care of his daughter, Rachel, who suffers from an idiopathic seizure disorder. Rachel was three or four years old in 1985.

Second, Altmeyer testified that he considered each candidate's prior supervisory experience in selecting the new leadperson. MacNeal had been the hose fabrication coordinator for approximately one year at the time of his promotion to leadperson. In that position, he had to delegate work assignments, arrange for temporary employees, and meet production demands. Altmeyer testified that he noted that MacNeal had succeeded Schmidt once before when he took over as hose fabrication coordinator at the time Schmidt became the leadperson. None of the other three candidates had ever been assigned to a permanent supervisory position within the warehouse. In his interview, Weiss was never asked about his experience as acting leadperson while Schmidt was away from the facility.

Third, Altmeyer testified that he considered the ability to communicate in determining who should be the new leadperson. He testified that MacNeal was a better communicator than Weiss, in his opinion. Altmeyer testified that MacNeal had demonstrated his ability to communicate with fellow employees when he was hose fabrication coordinator.

Before making the announcement at the general meeting, Altmeyer informed the other three candidates individually that MacNeal was selected as the new leadperson. Altmeyer called each of the candidates into his office on the morning of February 4, 1985 to tell them his decision. Lawton accepted the decision without comment.

Upon hearing the decision, Engel became upset and voiced his disagreement with Altmeyer's decision. By all accounts, an argument between Engel and Altmeyer ensued. Engel repeated his opinion that Weiss was the most qualified person for the job of leadperson, and he stated the MacNeal was an inappropriate choice. Engel said something to the effect that Altmeyer was a poor manager and that he had made a bad decision in selecting MacNeal as leadperson. Both men testified that their conversation grew loud and heated. Engel questioned why Weiss had not been promoted to leadperson. Engel testified that Altmeyer responded by roughly saying that, "As long as I'm the warehouse manager, no Jew will run the warehouse for me." Upon hearing this, Engel testified he immediately left Altmeyer's office. Altmeyer testified that he did not make the anti-semitic statement. No one else heard this conversation.

Engel went to Weiss and told him that he did not get the job as leadperson because he was Jewish. Weiss then went into Altmeyer's office, and Altmeyer informed him that MacNeal would be the new leadperson. Weiss became upset, and he criticized the decision. Weiss did not mention his religion or question Altmeyer about whether religion played any part in the decision. Weiss did not accuse Altmeyer of discrimination. Weiss testified that he did not confront Altmeyer with the anti-semitic comment at that time because he was afraid of losing his job altogether.

Later on the morning of February 4, 1985, Altmeyer held a general meeting at which he announced to all employees that MacNeal was the new leadperson. Altmeyer testified that Weiss and Engel booed and that Weiss made a derogatory remark about MacNeal during the general meeting. Following the general meeting, Weiss again spoke to Altmeyer in private and again criticized the selection of MacNeal as leadperson. Altmeyer also met with Engel a second time and told him to improve his attitude and support managerial decisions. Engel became upset, renewed his criticism of Altmeyer's decision, pounded Altmeyer's desk, and left the office slamming the door

behind him. Altmeyer called Engel back into the office and warned him about his disruptive behavior.

Subsequent to these events, MacNeal reported to Altmeyer that Weiss had threatened MacNeal. MacNeal testified that he took Weiss's comments as a veiled threat of physical harm. Weiss testified that he made no such threat of bodily harm. In the afternoon of February 4, 1985, Altmeyer called Weiss and Engel into his office yet again. Wallace Kowrach, the customer service specialist and Altmeyer's top assistant, was present at this meeting. Altmeyer testified that he warned Weiss and Engel about making threats against MacNeal and undermining MacNeal in the warehouse. Engel testified that Altmeyer further warned them that failure to go along with his decision and to cooperate with MacNeal could cost them their jobs. Weiss testified that Altmeyer warned them that they would "suffer the consequences" if MacNeal failed in his new position as leadperson. Weiss and Engel further testified that Altmeyer warned Engel that he would lose his job if he took any action regarding the statement Altmeyer made during their prior discussion. Weiss took this final warning to be a reference to the anti-semitic comment Engel had told him about.

Following MacNeal's promotion, Weiss's and Engel's job performance, which until then had been good if not excellent, began to deteriorate in the opinion of MacNeal and Altmeyer. According to MacNeal, Weiss and Engel did not cooperate with him as much as he hoped and expected of experienced, senior employees. MacNeal testified that they often left work early or failed to appear for work on the days the largest shipments were to arrive at the warehouse.

On February 7, 1985, Weiss and Engel met with an attorney to discuss Altmeyer's alleged anti-semitic comment and what they perceived to be religious discrimination by Parker Hannifan. Following the attorney's advice, Weiss and Engel made an appointment to file a discrimination complaint with the New Jersey Division of Civil Rights. They then planned on working within Parker Hannifan and bringing their allegations of discrimination to the attention of Altmeyer's superiors. The first possible appointment they could get with the Division of Civil Rights was March 4, 1985.

In the meantime, Altmeyer assigned Lawton to the position of hose fabrication coordinator following MacNeal's elevation to leadperson. On February 21, 1985, Altmeyer called a general meeting at which he announced to all employees that Kerry Tolas was replacing Lawton as hose fabrication coordinator. Altmeyer testified that Lawton simply did not work out as the coordinator. Altmeyer testified that at the general meeting Engel and Weiss expressed displeasure with the decision to replace Lawton with Tolas. After the general meeting, Altmeyer met in his office with Engel, and he told Engel that he was running out of patience with Engel's behavior. Engel criticized Altmeyer's latest decision and expressed dissatisfaction with the working environment. Altmeyer suggested that Engel may want to consider employment elsewhere.

Altmeyer also met again with Weiss to discuss his attitude and recent behavior. Altmeyer testified that Weiss renewed his criticism of Altmeyer's managerial decisions. Altmeyer advised Weiss that he could address any problems he had with Altmeyer to the personnel manager, Louis Petersen, or to Parker Hannifan's national distribution service center manager, Thomas Dickerson. Dickerson was Altmeyer's direct superior. Altmeyer did ask Weiss as a courtesy to contact Petersen first.

Later on February 21, 1985, Weiss contacted Petersen and told him about his problems with Altmeyer's selection of MacNeal as leadperson. Weiss did not mention his fears of religious discrimination because he felt that Petersen had broken his confidence on an unrelated, sensitive personnel problem in the past. Petersen informed Weiss that Dickerson would be in the Trenton facility sometime in the near future.

On February 27, 1985, Dickerson visited the Trenton facility, and Weiss talked to

him about Altmeyer's decision to make MacNeal the leadperson. According to Weiss's testimony, he told Dickerson about Altmeyer's anti-semitic remark and what Weiss perceived to be Altmeyer's threat to terminate Weiss if MacNeal failed as leadperson. Weiss also testified that he told Dickerson that he had an appointment to file a discrimination complaint with the New Jersey Division of Civil Rights. Weiss asked for Dickerson's help. Dickerson testified that Weiss did raise objections to MacNeal's selection as leadperson, but he denied that Weiss raised the issue of religious discrimination during their conversation on February 27. Dickerson testified that he did not learn of Weiss' allegations of discrimination until after Weiss was terminated. Dickerson promised to look into Weiss' complaints.

On Saturday, March 2, 1985, Engel reported for work at the warehouse. Sometime during the day, Engel used a rubber band to shoot a metal object in the general direction of a co-worker. MacNeal testified that the projectile was a two inch metal staple used to secure cardboard boxes, while Engel testified that it was a paper clip. The warehousemen had a common practice of shooting paper clips around the warehouse and often at each other. Indeed, various forms of horseplay were common in the warehouse. MacNeal saw Engel shoot the paper clip on this occasion, and he reported the incident to Altmeyer. MacNeal did not warn Engel about shooting paper clips, and he failed to report other similar incidents in the past.

On March 4, 1985, Weiss and Engel took off from work and attended their appointment with the New Jersey Division of Civil Rights. Weiss filed a complaint alleging religious discrimination against Parker Hannifan in the selection of MacNeal as leadperson of the Trenton distribution service center. Engel filed a complaint alleging that he was threatened with termination if he complained about Altmeyer's discriminatory treatment of Weiss. Also on March 4, Altmeyer sent Engel a letter by courier informing Engel that his employment had been terminated due to the paper clip shooting incident.

Engel apparently did not receive the termination letter, and he arrived for work at the warehouse on the morning of March 5, 1985. Altmeyer immediately called Engel into his office and told him that he was terminated. Altmeyer testified that Engel's shooting of the paper clip violated Parker Hannifan policy by endangering the safety of other employees. Prior to Engel's termination, no other employee in the Trenton distribution service center had been disciplined in any fashion for shooting a paper clip, let alone terminated for doing it.

When Engel was terminated on March 5, 1985, Weiss told Altmeyer that he had no means of transportation since he had carpooled with Engel that day. Altmeyer told Weiss that Parker Hannifan would pay for a cab if Weiss could not get another ride home from work. Weiss requested to take March 6 off in order to buy a car so he could get to work in the future. Altmeyer told Weiss that he could have March 6 off if he completed his work assignment of checking and storing items that had been received that morning. Weiss did not finish this work assignment, and he left work 45 minutes early. Weiss testified that he left early in order to get a ride home with a fellow employee. Weiss did not report to work on March 6.

On March 7, 1985, at the end of the work day, Petersen called Weiss into the office where Altmeyer was waiting. Altmeyer and Petersen then informed Weiss that his employment was terminated, and Altmeyer cited Weiss's failure to complete his work assignment as agreed on March 5 as the catalyst for their decision. In a letter addressed to Weiss and dated March 8, 1985, Altmeyer wrote that Weiss had been terminated due to his failure to perform his duties, his efforts to undermine Altmeyer by spreading rumors, and his persistent negative attitude towards managerial decisions. Joretta Williams, a black warehouseperson, testified that Weiss had told her that her job would be in jeopardy when Altmeyer came to Trenton because he was a Southerner.

Weiss testified that he told Petersen on March 7 that Altmeyer had discriminated against him, and he testified that he asked Petersen whether Dickerson had talked to him about Altmeyer's conduct. Weiss testified that Petersen responded by saying that Dickerson had signed Weiss's termination papers.

Altmeyer testified that, without more, failure to unload a truck and store the items in the warehouse on one occasion is not a serious act of misconduct and that it does not call for termination.

Neither Weiss nor Engel had ever been disciplined for any infraction of Parker Hannifan corporate policy or procedure prior to their terminations in March 1985. Weiss and Engel both received good evaluations from their superiors throughout their respective tenures with Parker Hannifan.

On March 22, 1985, both Weiss and Engel filed complaints with the New Jersey Division of Civil Rights alleging that they had been terminated by Parker Hannifan in retaliation for their complaints about the prior alleged religious discrimination against Weiss.

Altmeyer and Dickerson testified that they did not hear about Weiss's and Engel's allegations of discrimination until May 1985, two months after their terminations. As noted above, Weiss testified that he had told Dickerson about the alleged discrimination as well as the alleged anti-semitic remark in February 1985, and that he had brought up the subject with Altmeyer and Petersen on the day he was fired. Weiss further testified that he had told Dickerson that he was going to file a civil rights complaint with the New Jersey Division of Civil Rights. In addition, Engel testified that in February 1985 Altmeyer warned him not to take any action with regard to the anti-semitic remark Altmeyer allegedly had made about Weiss.

Regardless of when he first learned about plaintiff's charges of discrimination, Dickerson testified that it was the first case of discrimination that he had ever heard about during his eight year tenure with Parker Hannifan. Dickerson asked

Petersen to look into the allegations. Dickerson testified that Petersen must have summed up his investigation into this matter in a report, but Dickerson, the corporate manager who was directly responsible for all of the distribution service centers, did not recall what Petersen reported, and he did not read Petersen's report before testifying. Dickerson assumed that Petersen had concluded that the plaintiff's charges were groundless.

In accordance with his managerial routine, Altmeyer made file memoranda recounting the events and occurrences which occurred throughout the relevant period. One such memorandum seemingly refutes Altmeyer's assertion that he did not learn of plaintiff's discrimination charges until May 1985. In a memorandum dated March 11, 1985, Altmeyer wrote that "the subject of Mr. Weiss's religious belief or ethnic background" did not arise during any discussions he had had with Weiss, Engel or Lawton following his selection of MacNeal as the new leadperson in early February 1985. In the same memorandum, Altmeyer further wrote that, after he was terminated, Weiss only expressed concern about derogatory comments written in the warehouse rest room. At trial, Altmeyer testified that this memorandum was not actually written in March 1985, but that it was written in May or June 1985 and backdated to March 1985 after he became aware of plaintiff's civil rights complaints. Other file memoranda made by Altmeyer were introduced into evidence, and Altmeyer testified that they were all written on the date reflected on their faces.

From January 1 to March 4, 1985, Parker Hannifan paid Engel $3,446.58 in wages, including some overtime, and profit sharing benefits. After his termination by Parker Hannifan, Engel earned $7,224.37 working for two other firms for the remainder of 1985. Between his termination by Parker Hannifan and May 1987, he was able to find only seasonal employment. Since May 1987, Engel has been fully employed.

At the time he was terminated, Parker Hannifan provided Weiss with full medical insurance coverage for himself and his

family. Weiss has not had comparable medical coverage since his employment with Parker Hannifan ended. In 1984, Weiss earned $19,557.27 working for Parker Hannifan. In 1985, the year of his termination by the defendant, his total earned income was $8,409.00. He also earned $11,943.77 in 1986, $12,128.09 in 1987, $19,425.60 in 1988, and he and his wife earned over $30,000 combined in 1989. The record indicates that Weiss himself earned the bulk of the family income (i.e., certainly over $20,000) in 1989. Since 1985, Weiss has held a number of full and part time jobs, and he is currently employed. Due to his daughter's illness, Weiss incurred unreimbursed medical expenses following his termination by Parker Hannifan, including $7,978 in 1985, $4,951 in 1986, $5,595 in 1987, $6,576 in 1988, and $7,790 in 1989.

## II. CONCLUSIONS OF LAW

This court has jurisdiction over the present matter under Title VII, 42 U.S.C. § 2000e et seq., 28 U.S.C. § 1331, and the doctrine of pendent jurisdiction.

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e–2(a)(1). Title VII also makes it unlawful for an employer to "discriminate against any of his employees ... because he has opposed any practice under this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this chapter." 42 U.S.C. § 2000e–3(a).

The New Jersey Law Against Discrimination ("NJLAD") makes it unlawful for an employer "because of the ... creed ... of any individual ... to refuse to hire or employ or to bar or to discharge ... from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.J.S.A. § 10:5–12(a). The NJLAD also makes it unlawful for anyone

"to take reprisals against any person because he has opposed any practices or acts forbidden under this act or because he has filed a complaint, testified or assisted in any proceeding under this act." N.J.S.A. § 10:5–12(d).

A plaintiff must make the same factual showing in order to prove a claim under either Title VII or the NJLAD. *Baxter v. AT & T Communications*, 712 F.Supp. 1166, 1172 (D.N.J.1989); *see Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 865 (3d Cir.1990). In fact, the New Jersey Supreme Court has adopted the methodology of proof used in Title VII cases when applying the NJLAD. *See Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 549–50, 569 A.2d 793 (1990). Therefore, our analysis of the plaintiffs' state law claims will be subsumed within our application and discussion of Title VII.

"The burden of proof in Title VII cases is governed by the framework erected in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] ... (1973), and iterated by its progeny." *Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). The plaintiff has the initial burden to prove a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff has established such a *prima facie* case, the defendant then assumes the burden of rebutting the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its actions. Following the defendant's articulation of a legitimate reason, the burden shifts back to the plaintiff, who then may attempt to prove by a preponderance of the evidence that the proffered reasons for the defendant's actions were merely a pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25. Throughout the case, the plaintiff always maintains the ultimate burden of persuasion on the issue of the defendant's alleged discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). "The plaintiff may satisfy the ultimate burden of proving discrimination 'either direct-

ly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Jalil*, 873 F.2d at 706–07, *quoting Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

## A. *The Denial of the Promotion to Weiss*

A *prima facie* case of discrimination for denial of a promotion may be established by showing that: (1) the plaintiff is a member of a protected group; (2) he was qualified for the higher position; (3) he was considered for and denied the promotion; and (4) another employee of similar qualifications who was not a member of the relevant protected group was given the position. *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C.Cir.1981); *see Burdine*, 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6; *Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 n. 13 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983) ("the nature of the required showing depends on the circumstances of the case").

■ We conclude that Weiss has established a *prima facie* case of discrimination by a preponderance of the evidence. In this regard, we note that Weiss is Jewish and that we may reasonably infer from the evidence that he was qualified for the position of leadperson. Weiss had acted as leadperson on more than one occasion while the leadperson was not in the warehouse. He knew the entire warehouse function well, and he was the senior warehouseman after Schmidt, the soon to be departed leadperson. Weiss had experience shipping and receiving orders, preparing for temporary employees, assigning tasks, and doing all of the things a leadperson did. We can infer from Altmeyer's testimony that he felt that Weiss was qualified to be leadperson, although whether Altmeyer felt Weiss was the best candidate is another question. The fact that Weiss was one of the four men interviewed and considered for the job supports the conclusion that he was qualified to be the leadperson. Finally, it is undisputed that Weiss was considered for the position, that he was denied the position, and that another employee, MacNeal,

who is not Jewish and who had similar qualifications received the promotion to leadperson.

Parker Hannifan has advanced evidence of three reasons for Altmeyer's promotion of MacNeal over Weiss. First, MacNeal had better attendance, especially during normal business hours, than Weiss. Second, MacNeal had been hose fabrication coordinator, and Altmeyer, therefore, assumed that he had had more supervisory experience than Weiss. Altmeyer claims that he did not know that Weiss had been acting leadperson on occasion. Third, MacNeal was better able to communicate with the other employees than Weiss, in Altmeyer's opinion. All of Parker Hannifan's proffered reasons are legitimate and non-discriminatory considerations.

■ Despite the fact that we find Parker Hannifan's stated reasons for denying the promotion to Weiss to be legitimate, we conclude that Weiss has proven by a preponderance of the evidence that these reasons are merely pretextual.

In support of this conclusion, we find that Altmeyer did in fact utter the anti-semitic statement about which Engel testified. Engel and Altmeyer were the only parties to the discussion during which that remark was spoken. In response to his inquiry about why Weiss did not get the promotion, Engel claims that Altmeyer said something to the effect that, "As long as I'm the warehouse manager, no Jew will run the warehouse for me." Altmeyer denies making such a statement. However, we find Engel's account of this discussion more credible than Altmeyer's account. Under the circumstances of this case, we find no reason to question the credibility of Engel's testimony.

We find that Altmeyer's anti-semitic statement, which was said in direct reference to Weiss and contemporaneous to the decision to promote MacNeal, is strong evidence of the defendant's discriminatory intent. *See Walsdorf v. Board of Commissioners for East Jefferson Levee District*, 857 F.2d 1047, 1053 (5th Cir.1988) ("There may exist a more unequivocal way to express an intent to exclude [a Jewish per-

son] from consideration for a promotion, but none come readily to mind"); *cf. Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314 (6th Cir.1989) (obviously facetious and isolated statements which were made in front of many people and not directed at anyone in particular are not sufficient evidence of an intent to discriminate in a Title VII case).

We further find Altmeyer's testimony that he did not deny the promotion to Weiss due to his religion to be incredible. In fact, we find much of Altmeyer's testimony incredible. Our conclusion about Altmeyer's credibility emerges from the conclusions and inferences we draw from Altmeyer's explanation about the memorandum dated March 11, 1985, in which he noted Weiss's allegations of discrimination. Altmeyer and his direct superior, Dickerson, have steadfastly asserted that they did not know about the plaintiff's charges of discrimination until at least May 1985, two months after the plaintiffs were discharged. Altmeyer and Dickerson have taken this position despite the fact that Weiss claims that he discussed the issue with both of them prior to May 1985.

In an attempt to corroborate his story, Altmeyer now claims that the memorandum dated March 11, 1985 was actually written in May or June 1985 and then backdated. We do not accept Altmeyer's explanation of the March 11 memorandum. A better explanation is that Altmeyer actually wrote that document on March 11, 1985. We further find that he knew to address the discrimination issue in the memorandum because Weiss had in fact raised the issue with Altmeyer previously and because Altmeyer had made the anti-semitic remark which was overheard by Engel. Therefore, we find that Altmeyer wrote this memorandum on March 11, 1985, and that his testimony about backdating the memorandum is not worthy of credence. This conclusion is also supported by Altmeyer's admitted habit of drafting file memoranda and always dating them on the day they were written.

Our conclusion that Parker Hannifan's reasons for denying the promotion to Weiss are pretextual is further supported by the weakness of one of the proffered reasons. While it is true that MacNeal had prior supervisory experience, it is also true that Weiss had served as acting leadperson. We doubt that Altmeyer could have worked as manager of the Trenton distribution service center for five months prior to February 1985 and not know who acted as leadperson when Schmidt was not in the facility. We similarly note that there is evidence that the hose fabrication shop had some difficulties under MacNeal's leadership. We do not mean nor attempt to impugn Altmeyer's business judgment, but we do conclude that the prior supervisory experience rationale is hardly supported by much evidence other than MacNeal's title as hose fabrication coordinator.

■ The question is not whether Parker Hannifan's decision to choose MacNeal was an error of business judgment, but whether Weiss was discriminated against because of his religion. *See Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979). In light of our analysis, we conclude that Parker Hannifan did discriminate against Weiss by denying him the promotion to leadperson on the basis of his religion. Judgment will be entered in favor of Weiss on his claim of discriminatory denial of a promotion.

## B. *The Retaliatory Discharge Claims*

■ A plaintiff establishes a *prima facie* case of discriminatory retaliation by showing that: (1) he engaged in conduct protected by Title VII; (2) the employer took adverse action against him; and (3) a causal link exists between his protected conduct and the employer's adverse action. *Jalil,* 873 F.2d at 708; *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 375 (6th Cir.1984); *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980).

It is clear that both Weiss and Engel have proven a *prima facie* case of discriminatory retaliation by a preponderance of the evidence. Weiss was engaged in conduct protected by Title VII in that he filed a discrimination complaint with the New Jersey Division of Civil Rights and he did complain to Dickerson about Altmeyer's

discriminatory treatment. We did not find Dickerson credible when he testified that Weiss had not mentioned the issue of religious discrimination during their February 27, 1985 discussion. We find Weiss's explanations about why he did not raise the issue of discrimination with Petersen and Altmeyer in February 1985 to be credible. Weiss claimed that he was afraid he would lose his job if he brought it up directly with Altmeyer before discussing it with anyone else. With regard to Petersen, Weiss claimed to have lost trust in him after an earlier incident in which Petersen broke Weiss's confidence. Whether or not these explanations are well founded is not important, but they are believable and we accept them.

The credibility of Dickerson's testimony is also damaged by his explanation about what he did after he heard about the plaintiff's charges of discrimination. According to his testimony, Dickerson sent Petersen to Trenton to look into the allegations, and Dickerson believes that Petersen must have memorialized his investigation in a report. Although this was the first incident of alleged discrimination which Dickerson had ever encountered at Parker Hannifan, Dickerson did not remember seeing Petersen's report or what Petersen's conclusions were. Dickerson did not bother to look at Petersen's report before he came from Cleveland to testify in this supposedly unique case. We find this whole account incredible. For if it is not incredible, then Dickerson, the direct superior of the man accused of the bulk of the discriminatory acts, has shown an uncanny lack of sensitivity to this very serious issue.

In addition, Weiss told Dickerson that he had an appointment with the New Jersey Division of Civil Rights to file a complaint. Once again, we believe Weiss and reject Dickerson's testimony that Weiss did not mention the civil rights complaint during their discussion on February 27, 1985. Filing of a civil rights complaint, intending to file a civil rights complaint, and complaining about discrimination to corporate superiors are acts protected under Title VII. 42 U.S.C. § 2000e–3(a); *see Holsey v. Armour & Co.*, 743 F.2d 199, 211 (4th Cir.1984),

*cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985); *Hochstadt v. Worcester Foundation, etc.,* 545 F.2d 222, 231 (1st Cir.1976); *Gifford v. Atchison, T. & S.F.R. Co.,* 549 F.Supp. 1, 6 (C.D.Cal. 1980), *aff'd in part and rev'd in part on other grounds,* 685 F.2d 1149 (9th Cir. 1982).

Weiss easily satisfies the second prong of the *prima facie* case. His employment at Parker Hannifan's Trenton facility was terminated, and this clearly constitutes an adverse employment action under Title VII. *See Jalil,* 873 F.2d at 708.

In order to satisfy the third prong of the retaliatory discrimination standard, "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); *see Jalil,* 873 F.2d at 708. We conclude that Weiss has proven a causal connection between his discharge and his filing the civil rights complaint, as well as his personal complaints to Dickerson.

Weiss told Dickerson on February 27, 1985 that Altmeyer had discriminated against him and that he intended to file a complaint with the New Jersey Division of Civil Rights. Weiss filed the complaint on March 4, 1985. On March 5, 1985, he left work early and failed to complete a work assignment. On March 7, 1985, he was terminated, and the direct catalyst for the discharge was ostensibly his misconduct two days earlier. We further note that Dickerson himself signed Weiss's termination papers. The proximity with which these events occurred leads us to conclude that a causal link exists between Weiss's discussion with Dickerson on February 27 and his termination approximately one week later.

In order to satisfy its burden, Parker Hannifan argues that the decision to terminate Weiss was justified by his insubordination since MacNeal received the lead-

person job on February 4, 1985. Insubordination is a legitimate, non-discriminatory reason for discharging an employee. *Jalil,* 873 F.2d at 707; *Brown v. Parker-Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir. 1984). Since Parker Hannifan has articulated a legitimate reason for Weiss's termination, Weiss has the burden to prove that the proffered reason is pretextual.

We conclude that Parker Hannifan's articulated reason was in fact pretextual. The credible evidence supports the conclusion that Weiss was discharged because of his objections and complaints about Altmeyer's discriminatory conduct. As we have already concluded, Weiss was denied a promotion because of his religion. This act of discrimination came to light when Altmeyer made the anti-semitic comment to Engel. Weiss and Engel saw an attorney and made the first available appointment to file a complaint with the New Jersey Division of Civil Rights. Following Weiss's discussion with Dickerson on February 27, 1985 and Altmeyer's numerous discussions with Weiss and Engel, officials of Parker Hannifan clearly knew about most, if not all, of these developments. We do not find the defense witnesses' contrary testimony credible. For the reasons stated above, we reject the testimony of Altmeyer and Dickerson.

We further find that the proffered reason of insubordination is a slender reed upon which to rest a defense under the circumstances. The only evidence of Weiss's insubordination came from the testimony of Altmeyer and MacNeal. Weiss himself denied any insubordination during his last month of employment with Parker Hannifan. These allegations of insubordination were made against a man who had worked for two and one-half years at the Trenton facility without ever being disciplined. The evidence indicates that Weiss was a good worker, and he always received good evaluations from his superiors. We note that Parker Hannifan did not discharge Weiss prior to March 5 on the basis of his alleged "bad attitude" but that Parker Hannifan waited until Weiss failed to complete an assignment before terminating him. Parker Hannifan used Weiss's failure to fully unload a truck on March 5, 1985 as the catalyst for his termination, despite the fact that Altmeyer himself testified that merely failing to complete such an assignment is not grounds for termination. We further note that Parker Hannifan never disciplined Weiss, short of outright discharge, because of his insubordination. For instance, Weiss was never suspended or given a written reprimand.

While we do believe that Weiss' attitude did predictably sour after he was discriminatorily denied the promotion to leadperson, we do not conclude that any resulting insubordination was the true reason for his termination. Weiss has proven by a preponderance of the evidence that Parker Hannifan's proffered reason for his discharge was pretextual. Therefore, we conclude that Weiss was discharged by Parker Hannifan in retaliation for his protected conduct (i.e., filing the discrimination complaint and making discrimination allegations to Parker Hannifan officials). We further find that Weiss would not have been discharged but for his protected conduct. Judgment will be entered in favor of Weiss on his retaliatory discharge claim.

We also conclude that Engel was discharged by Parker Hannifan in retaliation for conduct protected under Title VII. Engel engaged in protected conduct when he filed a discrimination complaint with the New Jersey Division of Civil Rights and when he assisted Weiss in his inquiry into the discrimination surrounding MacNeal's promotion to leadperson. 42 U.S.C. § 2000e–3(a); *see Crockwell v. Blackmon-Mooring Steamatic, Inc.,* 627 F.Supp. 800, 807 (W.D.Tenn.1985). While it is not clear that Parker Hannifan knew that Engel himself was going to file a discrimination complaint, it can reasonably be inferred that Altmeyer and Dickerson knew that Engel had told Weiss about Altmeyer's anti-semitic remark. We can also infer that Altmeyer and Dickerson knew that Engel was cooperating with Weiss' attempts to rectify the prior discrimination.

Parker Hannifan took adverse action against Engel when he was terminated on March 5, 1985.

We find that Engel has proven by a preponderance of the evidence a causal connection between his discharge and his protected conduct. Once again, the proximity in time between Engel's conduct and his termination is persuasive in this regard. His termination occurred one week after Weiss informed Dickerson that Weiss was going to file a civil rights complaint. During that discussion, Weiss told Dickerson about Altmeyer's anti-semitic statement. Since Engel was the only person present when Altmeyer made the remark, it follows that Dickerson, let alone Altmeyer himself, knew that Engel was cooperating with Weiss in his efforts to bring Parker Hannifan's discrimination to light.

We also note the veiled threat that Altmeyer made to Engel on February 4, 1985, after he had made the anti-semitic remark. Engel and Weiss both testified that Altmeyer told Engel that he would lose his job if he did anything about the earlier comment. Altmeyer denied making such a threat, but we do not find his testimony to be credible. We believe the plaintiffs' testimony, and we accept the reasonable inference that Altmeyer was referring to the anti-semitic remark he had made earlier that day in Engel's presence. In light of Altmeyer's threat, we find it more than coincidental that Engel was discharged only a few days after Parker Hannifan learned that Weiss was going to file a discrimination complaint based largely on Altmeyer's anti-semitic statement.

Parker Hannifan again puts forth insubordination as the reason for Engel's discharge. Altmeyer also claimed that the paper clip incident posed a threat to worker safety and that it constituted an independent reason for Engel's termination. It is clear that insubordination and the safety of the workplace are legitimate, non-discriminatory reasons for discharging an employee. Therefore, Engel has the burden to prove that these reasons are merely a pretext for discrimination.

Engel has satisfied this burden, and we conclude that Parker Hannifan's proffered reasons are pretextual. We draw this conclusion from a number of factors. We again note a discrepancy between Engel and the defense witnesses about whether he was insubordinate after February 4, 1985. While we believe that Engel was upset and that his emotions affected his work, we do not fully accept Altmeyer's and MacNeal's negative characterizations of Engel's work during that period. Engel had never been disciplined throughout his tenure at Parker Hannifan until this time. Superiors consistently evaluated his work to be good, if not excellent.

We further note that shooting paper clips was a common practice in the Trenton distribution service center and that no one had ever been terminated, suspended or even given a written warning for such behavior before Engel. When the punishment so disproportionately outweighs the misconduct involved, the inference reasonably arises that the act of misconduct is being used as a pretext for the true motive behind the punishment. In this case, we recognize that Engel's shooting of the paper clip, like Weiss's failure to unload the truck, was Engel's first misstep on the job after Dickerson and Parker Hannifan learned about Weiss's intention to file a civil rights complaint. Finally, we rely again on our conclusion that Altmeyer did in fact threaten Engel if he did anything concerning Altmeyer's anti-semitic statement about Weiss.

Accordingly, we conclude that Engel was discharged by Parker Hannifan in retaliation for his protected conduct (i.e., assisting Weiss with the discrimination complaint and filing a complaint of his own). We find that Engel would not have been discharged but for his protected conduct. Therefore, judgment will be entered in favor of Engel on his retaliatory discharge claim.

## C.  Damages

The plaintiffs seeks damages for back pay, front pay and punitive damages.[1] Un-

---

1.  In his Proposed Findings of Fact and Conclusions of Law, Weiss also seeks damages for emotional distress or pain and suffering. We

note that such damages are not recoverable under Title VII.  *See Manders v. Oklahoma,* 875 F.2d 263, 265–66 (10th Cir.1989); *Hooten v.*

der Title VII, a victim of employment discrimination is entitled to back pay and reinstatement of his job. 42 U.S.C. § 2000e–5(g). This relief is equitable by nature, and it is intended to eliminate all effects of discriminatory employment practices and make the victims whole. *See Rios v. Enterprise Ass'n Steamfitters Local 638 of U.A.*, 501 F.2d 622, 629 (2d Cir.1974); *Robinson v. City of Lake Station*, 630 F.Supp. 1052, 1062 (N.D.Ind. 1986).

■ Weiss and Engel are entitled to an award of back pay less money received in mitigation. *Butler v. Coral Volkswagen, Inc.*, 629 F.Supp. 1034, 1041 (S.D.Fla.1986). Back pay is calculated as the difference "between actual earnings for the period and those [he] would have earned absent the discrimination by the defendant." *Horn v. Duke Homes*, 755 F.2d 599, 606 (7th Cir.1985). While this standard is easily stated, it may be difficult to apply under the circumstances of a given case. However, since back pay is intended as an equitable remedy, mathematical certainty and exactitude is not required, especially as long as the award is based on a reasonable method of calculation. *See Fabian v. Independent School District No. 89 of Oklahoma City*, 409 F.Supp. 94, 101 (W.D.Okl. 1976); *Brown v. Rollins, Inc.*, 397 F.Supp. 571, 579 (W.D.N.C.1974).

In order to fulfill the equitable purposes of Title VII, an award of back pay should include benefits which the victim of discrimination would have received absent the defendant's conduct. *See Crabtree v. Baptist Hospital of Gadsden, Inc.*, 749 F.2d 1501, 1502 (11th Cir.1985); *Whatley v. Skaggs Companies, Inc.*, 707 F.2d 1129, 1140 (10th Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 314 (1983) (profit sharing); *Pedreyra v. Cornell Prescription Pharmacies, Inc.*, 465 F.Supp. 936, 951 (D.Colo.1979) (medical insurance). From the duty to mitigate damages which is imposed on plaintiffs under Title VII, it

follows that the period for calculating an award of back pay ends when a plaintiff takes a comparable job to the one he lost. *See Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234–35 (7th Cir.1986). Therefore, once a plaintiff assumes a position which provides approximately the same remuneration and opportunity as the plaintiff's former position, he can no longer recover damages from the defendant.

Due to the different evidence presented by the two plaintiffs on the issue of damages, we will use slightly different methods to calculate their respective awards for back pay.

■ Weiss earned $19,557.27 from Parker Hannifan in 1984. While he obtained other employment following his discharge in 1985, he did not obtain a comparable level of pay until 1988, when he earned approximately $20,000. Accordingly, Weiss will only receive back pay based on his damages for 1985 through 1987. As part of his back pay award, Weiss is entitled to damages based on the wage he would have earned as leadperson (i.e., a 25 cent per hour premium above his former wage). To account for the leadperson salary increase, we will add an amount equal to $0.25 per hour for 50 weeks at 40 hours per week to each year of back pay. This addition comes to $500 per year. We have no indication about the number of hours that Weiss worked in 1984 or in the first two months of 1985.

Weiss's back pay damages will be calculated based on his past earnings at Parker Hannifan. By using his total earnings from 1984 as the yardstick, we may account for the number of hours, including overtime, and wages that may reasonably have been expected in later years. The formula for calculating Weiss's yearly back pay damages is his earnings from Parker Hannifan in 1984, plus the leadperson premium, plus his unreimbursed medical expenses for the year in question, minus his

*Pennsylvania College of Optometry*, 601 F.Supp. 1151, 1154 (E.D.Pa.1984). To the extent that damages for pain and suffering are recoverable under the NJLAD, or even Title VII itself, we conclude that there is insufficient evidence to support an award of such damages to Weiss, or even Engel, in this case. Therefore, Weiss's request for emotional distress damages will be denied.

actual earnings in mitigation for the year in question.

In 1985, Weiss earned $8,409 and incurred unreimbursed medical expenses of $7,978. His back pay damages for 1985 are $19,626.27 (i.e., $19,557.27 + $500 + $7,978 − $8,409).

In 1986, Weiss earned $11,943.77 and incurred unreimbursed medical expenses of $4,951. His back pay damages for 1986 are $13,064.50 (i.e., $19,557.27 + $500 + $4,951 − $11,943.77).

In 1987, Weiss earned $12,128.09 and incurred unreimbursed medical expenses of $5,595. His back pay damages for 1987 are $13,524.18 (i.e., $19,557.27 + $500 + $5,595 − $12,128.09).

In discussing Engel's award for back pay, we begin by noting that he only seeks back pay for the two years following his termination by Parker Hannifan. In fact, the evidence shows that Engel obtained a comparable job in May 1987, and, therefore, he would not be entitled to any back pay after that time anyway. Our calculation of Engel's award is simpler than Weiss's award because Engel does not seek any compensation for medical expenses, there is no salary premium to consider, and we know exactly how much he earned from Parker Hannifan until the date of his discharge.

The formula for Engel's award of back pay will be his projected earnings from Parker Hannifan for all of 1985, minus his projected earnings in mitigation for all of 1985. Engel will receive twice the resulting amount for the two years of recoverable damages.

The defendant employed Engel for the first 63 days of 1985. Between January 1 and March 4, 1985, Engel received $3,446.58 from Parker Hannifan. For the remainder of 1985, Engel earned $7,224.37 in mitigation from other jobs. If Engel had worked at Parker Hannifan for all of 1985, he would have earned $19,968.28 (i.e., $3,446.58 × 365/63). If he had worked for all of 1985 at the jobs he obtained after his discharge from Parker Hannifan, Engel would have earned $8,731.44 (i.e., $7,224.37 × 365/302). Therefore, Engel's damages for one year due to his discharge by Parker Hannifan are $11,236.84 (i.e., $19,968.28 − $8,731.44).

In order to further the "make whole" purpose of damages under Title VII, an amount for prejudgment interest will be included in the plaintiffs' awards for back pay. *See Green v. USX Corp.*, 843 F.2d 1511, 1530 & n. 16 (3d Cir.1988). The inclusion of prejudgment interest in the back pay award "makes the plaintiff whole by reimbursing [him] for the lost use of the money to which [he] was entitled." *Reeder–Baker v. Lincoln Nat'l Corp.*, 649 F.Supp. 647, 661 (N.D.Ind.1986), *aff'd*, 834 F.2d 1373 (7th Cir.1987). In calculating prejudgment interest under Title VII, the interest rate and the methodology to be applied are largely up to the court's discretion. *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 579 (6th Cir.1984); *Chang v. University of Rhode Island*, 606 F.Supp. 1161, 1275 (D.R.I.1985).

While Title VII is silent on the question of the appropriate interest rate, we find that the rate of prejudgment interest is a question of federal law and that 28 U.S.C. § 1961, the statute for postjudgment interest, provides the best guide for the calculation of the rate of prejudgment interest.[2] *Wooster Brush*, 727 F.2d at 579; *Reeder–Baker*, 649 F.Supp. at 662; *see Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3d Cir.1986). Section 1961 calls for application of the "rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of 52 week United States Treasury bills

---

2. We reject Weiss's invitation to apply an interest rate of 12% to the back pay award. Weiss suggests 12% would be an appropriate rate solely on the basis of one case in which the Third Circuit affirmed a back pay award computed by using that rate without commenting on the district court's reason for choosing the 12% figure. *See Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 889 (3d Cir.1984). Absent some clearer articulation why a rate such as 12% should be chosen seemingly at random, we will rely on the current fifty-two week T-bill rate.

settled immediately prior to the date of judgment."[3] That rate currently is 7.83%, and we will use this rate to calculate the plaintiffs' total awards for back pay, including prejudgment interest compounded per annum. *Reeder–Baker*, 649 F.Supp. at 662.

Accordingly, Weiss's total award for back pay is $61,644.91,[4] and Engel's total award for back pay is $30,385.50.[5]

**3.** We note that the analogous New Jersey rule provides a similar methodology for determining the applicable interest rate. That rule uses the current rate of return of the New Jersey Cash Management Fund for the calculation of post-judgment interest. N.J. Court Rule 4:42–11.

**4.** We obtained this figure by calculating the compounded interest at the rate of 7.83% per annum for each year of back pay damages from 1985, 1986 and 1987. For purposes of our calculations, we assumed that the back pay for each year accrued on the final day of the respective year and that the judgment would be entered on or about August 27, 1990, the 239th day of the year. As prejudgment interest is part of the equitable remedy scheme of Title VII, we find that our level of precision in these calculations is adequate to the task at hand. We further note that the interest could be compounded monthly beginning in April 1985, but we find our approach to be simpler and more equitable. *See Reeder–Baker*, 649 F.Supp. at 662 n. 25. Our calculations resulted in the following numbers:

(1) Damages for 1985 (i.e., March 8 through December 31, 1985)
Base back pay accrued on 12/31/85 = $19,626.27
Back pay plus interest, 12/31/86 =
$19,626.27 × 1.0783 = $21,163.01
Back pay plus interest, 12/31/87 =
$21,163.01 × 1.0783 = $22,820.07
Back pay plus interest, 12/31/88 =
$22,820.07 × 1.0783 = $24,606.88
Back pay plus interest, 12/31/89 =
$24,606.88 × 1.0783 = $26,533.60
Back pay plus interest through 8/27/90 =
$26,533.60 + ($26,533.60 × 0.0783 × 239/365) = $27,893.99

(2) Damages for 1986
Base back pay accrued on 12/31/86 = $13,064.50
Back pay plus interest, 12/31/87 =
$13,064.50 × 1.0783 = $14,087.45
Back pay plus interest, 12/31/88 =
$14,087.45 × 1.0783 = $15,190.50
Back pay plus interest, 12/31/89 =
$15,190.50 × 1.0783 = $16,379.91
Back pay plus interest through 8/27/90 =
$16,379.91 + ($16,379.91 × 0.0783 × 239/365) = $17,219.71

(3) Damages for 1987
Base back pay accrued on 12/31/87 = $13,524.18
Back pay plus interest, 12/31/88 =
$13,524.18 × 1.0783 = $14,583.12
Back pay plus interest, 12/31/89 =
$14,583.12 × 1.0783 = $15,724.98
Back pay plus interest through 8/27/90 =
$15,724.98 + ($15,724.98 × 0.0783 × 239/365) = $16,531.21

Weiss's total back pay award =
$27,893.99 + $17,219.71 + $16,531.21 = $61,644.91

**5.** We have calculated the prejudgment interest on Engel's award by the same method used with Weiss's award. We used the same interest rate and once again assumed that the date of judgment will be on or about August 27, 1990. Due to the two plaintiffs' different theories about when they incurred their respective back pay damages and the different evidence which we have for each of them, we will use a different fiscal year for calculating Engel's prejudgment interest. We will use the year March 5 through March 4 of the following year in determining Engel's back pay award. The only difference that the altered year will make is in the interest attributable to 1990. While Weiss will receive interest accrued between January 1 and August 27, 1990 (239 days), Engel will receive interest accrued between March 4 and August 27, 1990 (176 days). Our calculations for Engel result in the following numbers:

In addition, the plaintiffs also seek an award for front pay from the date of the entry of judgment. Front pay may be awarded as an equitable remedy in lieu of reinstatement when plaintiff's return to the work place would cause disharmony and acrimony. *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 890 (3d Cir.1984). However, front pay may only be awarded for a reasonable period required for the victim to reestablish his rightful place in the job market. *Green v. USX Corp.*, 843 F.2d at 1531; *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 795 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). Neither plaintiff seeks reinstatement of his old job with the defendant. The evidence clearly shows that both Weiss and Engel have been employed since their terminations by Parker Hannifan. Based on the evidence, we conclude that each of them has obtained a position in the job market roughly equal to where they would be if they had stayed with Parker Hannifan. Accordingly, we will not order an award of front pay for either Weiss or Engel.

Finally, the plaintiffs each seek an award of punitive damages equal to one percent of Parker Hannifan's net sales profit for 1985, the year of the discriminatory acts involved. The plaintiffs base their claims for punitive damages on the NJLAD, not Title VII. *See DeGrace v. Rumsfeld*, 614 F.2d 796, 808 (1st Cir.1980) (punitive damages not authorized under Title VII); *Richerson v. Jones*, 551 F.2d 918, 926 (3d Cir. 1977) (same); *Jackson v. Consolidated Rail Corp.*, 223 N.J.Super. 467, 482, 538 A.2d 1310 (App.Div.1988) (punitive damages available under the NJLAD).

Like any other case where punitive damages are available, punitive damages should only be awarded under the NJLAD in exceptional cases. *Gray v. Serruto Builders, Inc.*, 110 N.J.Super. 297, 319, 265 A.2d 404 (Ch.Div.1970), *citing DiGiovanni v. Pessel*, 55 N.J. 188, 260 A.2d 510 (1970). "Something more than the mere commission of a tort is always required for punitive damages." *DiGiovanni*, 55 N.J. at 190, 510 A.2d 260, *quoting* Prosser on Torts § 2 (2d ed. 1955). In order for punitive damages to be awarded, the defendant's conduct must have been wantonly reckless or malicious. *Jackson*, 223 N.J. Super. at 483, 538 A.2d 1310. Under New Jersey law, the exceptional nature of a given case and the wanton or malicious nature of the defendant's conduct are questions for the finder of fact. *See id.* at 482–83, 538 A.2d 1310. In general, the

(1) Damages for March 5, 1985 through March 4, 1986

| | | | |
|---|---|---|---|
| Base back pay accrued on 3/4/86 | = | | $11,236.84 |
| Back pay plus interest, 3/4/87 | = | | |
| | $11,236.84 × | 1.0783 | = $12,116.68 |
| Back pay plus interest, 3/4/88 | = | | |
| | $12,116.68 × | 1.0783 | = $13,065.42 |
| Back pay plus interest, 3/4/89 | = | | |
| | $13,065.42 × | 1.0783 | = $14,088.44 |
| Back pay plus interest, 3/4/90 | = | | |
| | $14,088.44 × | 1.0783 | = $15,191.57 |
| Back pay plus interest through 8/27/90 = | | | |
| $15,191.57 + ($15,191.57 × 0.0783 × 176/365) | | | = $15,765.14 |

(2) Damages for March 5, 1986 through March 4, 1987

| | | | |
|---|---|---|---|
| Base back pay accrued on 3/4/87 | = | | $11,236.84 |
| Back pay plus interest, 3/4/88 | = | | |
| | $11,236.84 × | 1.0783 | = $12,116.68 |
| Back pay plus interest, 3/4/89 | = | | |
| | $12,116.68 × | 1.0783 | = $13,065.42 |
| Back pay plus interest, 3/4/90 | = | | |
| | $13,065.42 × | 1.0783 | = $14,088.44 |
| Back pay plus interest through 8/27/90 = | | | |
| $14,088.44 + ($14,088.44 × 0.0783 × 176/365) | | | = $14,620.36 |

Engel's total back pay award =

$15,765.14 + $14,620.36 = $30,385.50

decision whether to award punitive damages is solely within the discretion of the finder of fact, and it may choose to deny punitive damages even though intentional or malicious behavior is evident.[6]  22 Am. Jur.2d, Damages § 739 (1988).

■ We conclude that an award of punitive damages would not be appropriate in the present case.  While there is some evidence of Altmeyer's intent to discriminate against Weiss and Parker Hannifan's intent to impermissibly retaliate against both plaintiffs, we find that this is not such an exceptional case so as to warrant the imposition of punitive damages.  It should be remembered that punitive damages are intended to punish wrongdoers, not to enrich victims.  In this regard, we note that the plaintiffs are not entitled to punitive damages simply because the defendant's officials acted wrongly and intentionally.  By its very nature, a charge of religious discrimination embodies ideas of intent and wrongdoing that seem to fit the ordinary definition of wanton or malicious conduct.  However, it follows that a plaintiff must show more than the minimum conduct necessary to prove the underlying cause of action before an award of punitive damages becomes appropriate.  If such were not the case, punitive damages would be awarded, even required, whenever a party proved a discrimination claim under the NJLAD.  Under the circumstances of this case, we will deny the plaintiffs' requests for punitive damages.

### D.  *Conclusion*

In summary, judgment will be entered in favor of Weiss on both his retaliatory discharge claim and his claim for discriminatory denial of a promotion.  Weiss will be awarded $61,644.91.  Judgment will also be entered in favor of Engel on his retaliatory

discharge claim, and he will be awarded $30,385.50.  We conclude that the plaintiffs are prevailing parties in this action within the meaning of 42 U.S.C. § 2000e–5(k), and we will await further submissions from their counsel before addressing the issue of attorney's fees and costs.  An order consistent with this opinion has been entered.

---

[6]  "Punitive damages are generally not recovered as a matter of right, even though the facts of the case may be such as to make their allowance proper, but rather, that their allowance rests in the discretion of the jury, or the court when it acts as the trier of fact.  It is within the discretion of the trier of fact to make an award of punitive damages, if there is a legal foundation in the record for an award.  Conversely, the jury may refuse to award such damages without regard to the evidence, even though fraud or malice is shown, no matter how wanton or reckless the defendant has been, and an instruction is erroneous which directs or requires the jury to award such damages.  And ... it is for the jury to decide whether to impose punitive damages based on the enormity of the wrong and the necessity of preventing similar acts...."  22 Am.Jur.2d, Damages § 739 (1988).